893 A.2d 1236

Joan M. BANASHAK et al.

v.

Gerard Wm. WITTSTADT, Sr., Successor Personal Representative of the Estate of Viola M. Uhl, et al.

No. 0589, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 6, 2006.

630

Clay M. Barnes (Barnes and Raine, PA, on brief), Towson, for appellant.

Robert L. Hanley, Jr. (Nolan, Plumhoff & Williams, Chtd., on brief), Towson, for appellee.

Panel KRAUSER, BARBERA and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

In this nine-year-old challenge to the administration of Viola M. Uhl's estate, there are haunting echoes of *Jarndyce and Jarndyce*.[1] Ironically, what is now before us, even nine years down the track, is not yet an appeal from a decision boasting finality, but only the third attempt to have this Court intervene in a work still painfully in progress.[2]

The allusion to *Jarndyce and Jarndyce* is no mere literary flourish. This case, as will become clear, could literally end up the same way. A seventy-seven-year old widow left an uncomplicated estate, worth approximately $262,000 according to the Sixth and Final Administration Account of April 22, 2005, to her two sisters-in-law. One of them only outlived the testatrix by seven years and, therefore, collected nothing. The other, when the dust finally settles and all bills are in,

---

**1.** In Charles Dickens's *Bleak House, Jarndyce and Jarndyce* was the legendary action in Chancery into which generations of litigants and litigators had been born and out of which they died even as the case ground inexorably onward. *Jarndyce and Jarndyce* was only concluded, decades after it began and not remotely on its merits, when the Lord High Chancellor declared the venerable challenge to John Jarndyce's Last Will and Testament moot because lawyers' fees and other expenses had consumed every last farthing of the once formidable estate.

**2.** On December 20, 1999, we filed a 16–page unpublished opinion under the case name of *Kresslein v. Banashak* (No. 05584, September Term, 1998). We held that the Orphans' Court was in error in ordering the removal of a personal representative without affording that personal representative the opportunity to present evidence and to argue his case.

On December 2, 2002, we filed a three-page unpublished opinion under the case name of *Banashak v. Renner* (No.1936, September Term, 2001). We held that the Orphans' Court was not in error in refusing to transmit a redundant issue to a circuit court jury for fact-finding. Other than illustrating the depth of the labyrinth, neither decision is pertinent to any issue now before us.

could end up with little more than enough to buy a cup of coffee. Such a shocking result, should it come to pass, could bring down the glare of intense public scrutiny on the question of how such a travesty could be permitted to come about. We will not get to address that issue, however, because of an insurmountable preliminary hurdle. Our focus will be exclusively on the threshold issue of appealability.

### A Long, Long Trail Awinding

As well befits a case that has lingered long in "chancery," its procedural trail is, or is rapidly becoming, labyrinthine. Viola M. Uhl died in Baltimore County on September 4, 1996. It has ultimately been established that she left a Last Will and Testament, signed by her on February 26, 1969, that was supplemented by a Codicil, signed by her on June 24, 1995.[3] Dorothy Uhl Banashak and Margaret Uhl Thelen were the sisters-in-law of the testatrix and were initially the exclusive legatees under that Will and Codicil.[4] The estate itself, represented by Gerard William Wittstadt, Sr., as its successor personal representative, is the formal appellee.

Complicating matters from the outset was an ostensible subsequent Last Will and Testament, allegedly executed by Viola Uhl on July 1, 1996. Unfortunately for the procedural history of this case, the ostensible Last Will and Testament of July 1, 1996 won the race to the courthouse door, and thereby hangs the tale.[5]

---

3. In her Last Will and Testament of February 26, 1969, Viola Uhl had left her entire estate to her husband, Andrew G. Uhl, and, if he predeceased her, then to his sisters, Margaret Uhl Thelen and Dorothy Uhl Banashak. Andrew G. Uhl died on January 19, 1995. On June 24, 1995, Viola Uhl executed the Codicil, reaffirming her bequests to her sisters-in-law and making those bequests direct instead of merely contingent.

4. Dorothy Uhl Banashak subsequently died, apparently at some time in 2003, and her daughter, Joan M. Banashak, was appointed Personal Representative of her estate. Joan M. Banashak and Margaret Uhl Thelen are the appellants in this case.

5. *As You Like It*, II, vii, 28.

## Phase I: September 20, 1996–April 13, 2000

## Tenure of Charles Kresslein, Jr.

### As Personal Representative/ Special Administrator

On September 18, 1996, two weeks after Viola Uhl's death, Charles H. Kresslein, Jr., Esq., filed a Petition for Probate with the Orphans' Court for Baltimore County, seeking the administrative probate of the July 1, 1996 Will. An order was signed by the Register of Wills on September 20, admitting the July 1, 1996 Will to probate and appointing Charles Kresslein, Jr. as personal representative of the estate.

The provisions of the ostensible Will of July 1, 1996, differed dramatically from those that had been made by Viola Uhl in her Will of 1969, supplemented by the Codicil of 1995. Whereas in her earlier Will, Viola Uhl had left her entire estate to her two sisters-in-law, the ostensible Will of July 1, 1996, left her home, along with its contents, "to my friend Opal Bowling." Of the remainder of the estate, 10% was left to each of the two sisters-in-law. Fifty percent was left to Marlene E. Higgins and her husband, James W. Higgins. Fifteen percent of the remainder of the estate was left to "my dear friend and attorney Charles H. Kresslein, Jr." In addition to being a legatee, Mr. Kresslein had 1) prepared the Will, 2) been one of the two witnesses to the Will, and 3) was appointed in the Will as personal representative. The remaining 15% was bequeathed to "my dear friend and financial advisor John R. Cameron," who was also the other witness to the ostensible signing of the Will.

Charles Kresslein, Jr. had, five weeks earlier, also prepared a Will, which Viola Uhl ostensibly signed on May 28, 1996. The only difference between the two 1996 Wills was that the

---

*Horton v. Horton*, 158 Md. 626, 633–37, 149 A. 552 (1930), however, arguably stands for the proposition that in a case where there are competing wills, with competing casts of legatees and would-be personal representatives, the group that first receives testamentary letters does not necessarily get to enjoy the inertial advantages of representing the *status quo ante.*

July 1 version included the devise of the real property to Opal Bowling, which the May 28 version had not.

On March 17, 1997, the appellants filed with the Orphans' Court a Petition to Caveat the Last Will and Testament of July 1, 1996. In the nine-page petition, they alleged, *inter alia*, 1) the existence of the 1969 Will and 1995 Codicil; 2) that Viola Uhl was not, as of the time of the ostensible July 1, 1996 Will, of sound and disposing mind and lacked the testamentary capacity to execute a valid will; 3) that Viola Uhl had been subjected to undue influence by the new legatees who had been in a relationship of trust and confidence with her, especially Charles Kresslein, Jr.; and 4) that the ostensible July 1, 1996 Will had not actually been signed by Viola Uhl nor by any other person on her behalf and by her direction.

The petition also specifically requested that Charles Kresslein, Jr. be removed as Personal Representative and that an independent special administrator be appointed. On March 18, an order of the Orphans' Court directed Mr. Kresslein to answer the Petition to Caveat within 20 days. It also informed him 1) that, pursuant to Maryland Code, Estates and Trusts Article, § 5–207(b) and § 6–307, the administrative probate was now a judicial probate and 2) that his official status vis-a-vis the estate was changed from that of Personal Representative to that of Special Administrator. See *Carrick v. Henley*, 44 Md.App. 124, 407 A.2d 765 (1979). On April 4, Mr. Kresslein filed his Answer to the Petition to Caveat.

Charles Kresslein, Jr. hired the law firm of his son, Charles J. Kresslein, Esq., to defend the caveat. On September 18, 1997, Charles Kresslein, Jr. filed with the Orphans' Court a Petition for Attorneys' Fees in the amount of $5,355.93. The appellants filed an exception to that petition on September 26 and requested that a hearing be held. A little over six months later, on April 7, 1998, a hearing was held on the pending fee petition. As a result of that hearing, the Orphans' Court, on April 9, issued an Order as follows:

*The Personal Representative failed to establish that he is defending the Caveat in good faith and with just cause.*

The Court finds that *the Personal Representative has a conflict of interest. He drafted the will, witnessed the will, named himself Personal Representative and also included a 15% specific bequest to himself.*

It is therefore Ordered on this 9th day of April, 1998, the Orphans' Court shall defer all attorney fees requested by Charles H. Kresslein, Jr., Esq. until the conclusion of the Caveat litigation.

All attorney fees shall be returned to the estate.

Mr. *Charles H. Kresslein, Jr., Esq. shall voluntarily resign* until the conclusion of the Caveat proceeding.

If the will dated July 1, 1996 prevails, the named Personal Representative shall be reinstated.

The Court order dated September 26, 1997 is hereby rescinded.

(Emphasis supplied).

That fee petition for the payment of $5,355.93 to the former law firm of Charles J. Kresslein is not one of the petitions still before the Orphans' Court for resolution and forming the basis for this appeal. Although on September 26, 1997, the Orphans' Court ordered that the requested fee be paid to the law firm, that order was later rescinded as part of the decision on April 9, 1998. The successor firm to that law firm advised the Orphans' Court on January 28, 2005, that it was making no claim against the estate for legal fees.

On October 21, 1997, Mr. Kresslein switched legal representation from his son's law firm to the law office of Edward B. Rybczynski, Esq. Mr. Rybczynski was the attorney of record for the estate at the hearing of April 7, 1998. On May 7, Mr. Rybczynski appealed the Orphans' Court decision of April 9 to the Circuit Court for Baltimore County, asking for a trial *de novo* pursuant to Courts and Judicial Proceedings Article, § 12–502. On July 27, 1998, the Circuit Court dismissed that *de novo* appeal for reason that the appeal was premature in that it was not from a final judgment.

In the meantime, Mr. Kresslein had disputed the statement made by the Orphans' Court that he had, apparently in chambers, agreed voluntarily to resign as personal representative/special administrator.[6] When he refused to resign, the appellants, on June 17, petitioned the Orphans' Court to remove him as Personal Representative (actually as Special Administrator). The appellants followed up, on July 10, with a Motion to Specifically Enforce Agreement Regarding Resignation of Charles H. Kresslein, Jr., as "Personal Representative." On July 31, the Orphans' Court, without holding a full evidentiary hearing, ordered Mr. Kresslein to resign.

1. ORDERED that the Motion to Specifically Enforce the Agreement of Charles H. Kresslein, Jr. to resign as Personal Representative of the Estate of Viola M. Uhl is hereby *GRANTED:* and

2. IT IS FURTHER ORDERED that *Charles H. Kresslein, Jr., is hereby directed to resign as Personal Representative* of the Estate of Viola M. Uhl until the conclusion of the caveat proceedings.

(Emphasis supplied).

There followed the first appeal to this Court. Our decision of December 20, 1999, reversed the July 31, 1998 order of the Orphans' Court because Mr. Kresslein had requested the right to call witnesses and had erroneously been denied the right to "a plenary hearing on the question of his removal as personal representative." Although this Court remanded the case so that a full evidentiary hearing could be conducted on the question of Mr. Kresslein's removal, such a hearing never came to pass. On March 22, 2000, Charles Kresslein, Jr., submitted a written letter of resignation as Personal Representative, to be effective 20 days later.[7]

---

6. The Orphans' Court record reflects that at the April 7, 1998 hearing Mr. Rybczynski, representing Mr. Kresslein, stated to the court that "the personal representative shall voluntarily step down until the Caveat proceeding is heard."

7. When the merits of the fee petitions in this case are ultimately considered by the Orphans' Court, the question of Charles Kresslein,

One has to wonder why, after spending four years and thousands of dollars to defend his incumbency, Mr. Kresslein

Jr.'s right to continue as special administrator will inevitably arise, notwithstanding the fact that his timely resignation prevented an earlier ruling on that issue. On April 9, 1998, the Orphans' Court found that Mr. Kresslein had "failed to establish that he [was] defending the caveat in good faith and with just cause." On July 31, 1998, the Orphans' Court ordered Mr. Kresslein "to resign as Personal Representative" (he was actually the Special Administrator).

The question will arise in connection with the issue of who is responsible for the legal costs incurred in the course of Mr. Kresslein's appeal to this Court of the Orphans' Court's decision to remove him. Technically, Mr. Kresslein prevailed on that appeal, but on a procedural issue rather than on the merits. The case was remanded to the Orphans' Court for a hearing on the merits, but Mr. Kresslein resigned before such a hearing could be held.

In view of that procedural twist, both sides will inevitably argue the applicability of the holding in *Sullivan v. Doyle*, 193 Md. 421, 431–32, 67 A.2d 246 (1949):

The rule has long been established that where a person has the right to administer upon an estate, he is entitled to pay out of the estate reasonable counsel fees incurred in the successful defense of that right. This rule was laid down in *Ex parte Young*, 8 Gill 285, by analogy to the practice of allowing an executor to pay counsel fees for the successful defense of a will. But *this Court has also distinctly held that an administrator whose letters are revoked, on the ground that they were prematurely or improvidently granted, is not entitled to be allowed counsel fees out of the estate for defending his position.* The reason for this rule is that *legal services rendered by an attorney in defending letters of administration which are revoked cannot be said to be for the benefit of the estate.*

(Emphasis supplied).

Grappling with precisely the same procedural twist, counsel will also battle over the applicability of the holding in *Horton v. Horton*, 158 Md. 626, 634, 149 A. 552 (1930):

*[W]hen,* instead of surrendering the office, and filing a new application for letters, *she elected to contest the revocation of her letters, she did so at her risk,* and the estate should not be charged with the expense of the resulting litigation.... Counsel fees can only be allowed for services rendered for the "recovery and security of the estate." And *it is not apparent how services rendered in defending letters of administration, which were ultimately revoked ... can be said to be for the benefit of the estate.*

(Emphasis supplied).

Both cases stand, at the very least, for the proposition that when an orphans' court considers the merits of a fee petition, it is enjoined to take into consideration not simply the tactical question of the billing hours and the work product of the attorney but also the antecedent strategic question of both the wisdom and the motive of the client in hiring the attorney for the particular piece of litigation in issue. Exceptions to a fee petition may focus as surely on the client as on the attorney.

would suddenly throw in the towel. A gargantuan effort had produced nothing. What, then, was the purpose and what was the motive for conducting such a "scorched-earth" defense in the first place? *Carrick v. Henley,* 44 Md.App. 124, 126–31, 407 A.2d 765 (1979), confirms the legal right of a personal representative acting as a special administrator to defend his incumbency, but it does not answer the question of why he should choose to do so.

The appellants petitioned for the appointment of an independent Special Administrator. On April 13, 2000, the Orphans' Court officially accepted the resignation, as of that date, of Charles H. Kresslein, Jr., as "Personal Representative." With that termination of the tenure of Charles Kresslein, Jr. as Personal Representative/Special Administrator, the first distinct phase of this litigation came to an end. That phase had lasted for three and one-half years—from September 18, 1996 through April 13, 2000. For two and one-half of those years, Mr. Kresslein had retained the legal services for the estate of Edward B. Rybczynski and Kenneth A. Bogan, whose joint Petition for Allowance of Counsel Fees is one of the two petitions that are still in litigation and are the subject matter of this appeal.

The great bulk, although not necessarily all, of the legal work done during that period consisted of defending against the appellants' efforts to have Mr. Kresslein removed as the "Personal Representative" of the estate. The more prominent adjudicative events in the course of that defense were 1) the Orphans' Court hearing of April 7, 1998; 2) the abortive attempt to appeal the results of that hearing to the circuit court; 3) the hearing before the Orphans' Court of July 29, 1998, leading to the removal of Mr. Kresslein as "Personal Representative" on July 31, 1998; and 4) the first appeal to this Court resulting in our reversal of that dismissal order on December 20, 1999.

### Phase II: April 13, 2000–January 5, 2005

### Tenure of Thomas Renner as Special Administrator

In that same proceeding on April 13, 2000, the Orphans' Court appointed Thomas James Renner, Esq., as Special Administrator of the estate. The tenure of Thomas Renner in that capacity continued for almost five additional years, from April 13, 2000 through January 5, 2005. Whereas the first phase of the overall litigation had involved largely the ultimately unsuccessful defense of Charles Kresslein, Jr., against the efforts to have him removed as Personal Representative/Special Administrator, the second phase, during the tenure of Thomas Renner, involved essentially the basic merits of the caveat. On April 21, 2000, Marlene and James Higgins, two of the legatees under the purported Will of July 1, 1996, moved for leave to intervene in the case and to file their own answers to the petition to caveat. Permission was granted and the Higginses participated in all subsequent caveat proceedings.

Other than the flurry of petitions for attorneys' fees, amended petitions for attorneys' fees, and prompt exceptions to every such petition, the next step forward in the progress of the case took place on October 10, 2001, when the Orphans' Court, after a petition, an amended petition, a second amended petition, the filing of legal memoranda by both caveators and caveatees, and a hearing, framed seven issues for fact-finding by a circuit court jury pursuant to Maryland Rule 6–434. See *Hill v. Lewis*, 21 Md.App. 121, 125–32, 318 A.2d 850 (1974).

Almost three years went by, however, before those jury findings were forthcoming because of yet another appellate interruption. The appellants, aggrieved at the decision of the Orphans' Court not to frame an additional issue, appealed that decision to this Court. The appellants wanted the jury specifically to determine whether Charles Kresslein, Jr., as both the preparer of the July 1, 1996 Will and a legatee under the Will, was guilty of a violation of Maryland Lawyers' Rule of Professional Conduct 1.8(c), which provides:

*A lawyer shall not prepare an instrument giving the lawyer* or a person related to the lawyer as parent, child, sibling or spouse *any substantial gift from a client, including a testamentary gift,* except where:

(1) the client is related to the donee; or

(2) the client is represented by independent counsel in connection with the gift.

(Emphasis supplied).

Ruling that the "same evidence that would be admissible to prove a violation of the Rule would be admissible to establish either fraud or undue influence," we held that the question was unnecessary and affirmed the decision of the Orphans' Court not to transmit it. *Banashak v. Renner,* No.1936, September Term, 2001, 148 Md.App. 714 (filed December 9, 2002).

We would like to have been able to ask, could we have been transported back to October 10, 2001, both caveators and caveatees alike, "Even if you win, in terms of one issue more or less will it have been worth three years?" "And thousands of dollars?" The question, of course, cuts both ways. "Is it worth pushing?" "Is it worth opposing?" Perhaps this is good reason why Orphans' Court judges need to be able to look over the shoulders of special administrators, if not of others. Perhaps some neutral referee should be able to make the overriding judgment that the dance is sometimes not worth the candle.

Following the remand from this Court, the remaining issues were sent to the Circuit Court for Baltimore County on May 22, 2003. A six day jury trial commenced on June 16, 2004 (eleven months later), and on June 24 the jury returned the following answers to the following questions:

1. *Were the last Will and Testament* of Viola M. Uhl dated February 26, 1969 *and the First Codicil* to said Will dated June 24, 1995 *revoked* after the making thereof and before July 1, 1996, including by any other paper writing purporting to be her Last Will and Testament?

| | X |
| --- | --- |
| Yes | No |

2. *Was the paper writing* dated July 1, 1996, purporting to be the Last Will and Testament of Viola M. Uhl, *signed by her or by some other person for her in her presence* and by her express direction, and attested and subscribed in her presence by two or more credible witnesses?

| | X |
| --- | --- |
| Yes | No |

3. *Were the contents* of the paper writing dated July 1, 1996, purporting to be the Last Will and Testament of Viola M. Uhl, *read to or by her, or known to her* at or before the time of the alleged execution thereof?

| | X |
| --- | --- |
| Yes | No |

4. *Was the paper writing* dated July 1, 1996, purporting to be the Last Will and Testament of Viola M. Uhl, *executed by her when she was legally competent* to make a valid Will?

| | X |
| --- | --- |
| Yes | No |

5. *Was the paper writing* dated July 1, 1996, purporting to be the Last Will and Testament of Viola M. Uhl, *procured by undue influence* exercised and practiced upon her?

| X | |
| --- | --- |
| Yes | No |

6. *Is the paper writing* bearing the date of July 1, 1996, *the Last Will and Testament [of] Viola M. Uhl?*

| | X |
| --- | --- |
| Yes | No |

(Emphasis supplied).

After those jury findings were reported back to the Orphans' Court, that court, on October 25, 2004, entered an Order declaring that the purported Will of July 1, 1996 was not the valid Last Will and Testament of Viola M. Uhl, and declared that July 1, 1996 document to be "NULL and VOID." In the meantime, Gerard William Wittstadt, Sr., on October

21, 2004, offered for judicial probate the February 26, 1969 Last Will and Testament and June 24, 1995 Codicil of Viola Uhl.

Not yet down for the count, however, both Mr. Renner and the Higginses urged on the Orphans' Court the proposition that the jury findings of June 24, 2004 had only found the July 1, 1996 document to be null and void and had made no such finding with respect to the purported Will of May 28, 1996. That argument was made notwithstanding the fact that the May 28, 1996 document had been introduced into evidence at the jury trial as a joint exhibit and had been the subject of extensive testimony during the trial. The jury finding, moreover, that the 1969 Will and 1995 Codicil had not been revoked "by any other paper writing purporting to be her Last Will and Testament" would appear to have been equally fatal to both 1996 documents alike.

The Orphans' Court nevertheless conducted yet another plenary hearing on December 3, 2004, at which extensive portions of the circuit court record, including papers contained in the court file, exhibits offered into evidence, and transcripts of much of the testimony before the jury were presented.

Eight and one-half years after it began, the caveat phase of this litigation officially ground to an apparent halt on January 5, 2005, when the Orphans' Court issued a four-page Memorandum Opinion and Order. That Order ruled that the May 28, 1996 document was invalid, just as the July 1, 1996 document had been invalid. Mr. Renner's tenure as Special Administrator, which had lasted almost five years, was over. The caveators had won, but had they won anything more than a Pyrrhic victory? When all the wreckage has been cleared away, will there be anything, other than wounded pride, worth salvaging?

### Phase III: January 5, 2005–Present

### Tenure of Gerard Wittstadt as Personal Representative

That same Memorandum Opinion and Order admitted to judicial probate Viola Uhl's February 26, 1969 Last Will and

Testament along with her June 24, 1995 Codicil. Former Judge Gerard W. Wittstadt, Sr., who had prepared both the 1969 Will before going on the bench and the 1995 Codicil after retiring from the bench, was appointed as the Personal Representative of the estate. That probate, in its own right, would appear to be moving toward a quick and uncontroversial conclusion. That conclusion, however, must abide the disposition of two still unresolved sequelae of the eight and one-half year caveat proceeding.

## Two Fee Petitions

Although the merits of the caveat had at long last been resolved, the brooding question of fees for legal work done during the course of that caveat had not. This straggler issue promises to be more problematic than the caveat itself. The Order of the Orphans' Court of April 9, 1998, had deferred all questions of attorney fees "until the conclusion of the caveat litigation." See *National Wildlife Federation v. Foster*, 83 Md.App. 484, 495–500, 575 A.2d 776 (1990). Two petitions for attorneys' fees were still before the Orphans' Court when it scheduled a hearing for February 16, 2005, to consider the Fee Petitions and the Exceptions thereto that had been filed by the appellants.

The first of the two petitions was the joint petition filed by Edward B. Rybczynski and Kenneth A. Bogdan on January 16, 2001. Exceptions were filed by the appellants. The amount of the fee ultimately requested is $29,886. That fee petition described the essential nature of the legal work done during those years:

a. Defense of the Caveat Proceeding instituted by Banashak and Thelen;

b. Defense and Appeal of the Objection [to] Counsel Fees filed by Banashak and Thelen;

c. Defense and Appeal of the attempts by Banashak and Thelen improperly to remove the Personal Representative; and

d. Administration of the estate.

The series of petitions for fees submitted by Thomas J. Renner, the Special Administrator of the Estate between April 13, 2000, and January 5, 2005, is a bit more blurred, because they combine claims for 1) legal fees and 2) commissions due to Mr. Renner in his capacity as Special Administrator. See Estates and Trusts Article, § 7–602(c). And see *Wright v. Nuttle*, 267 Md. 698, 700–02, 298 A.2d 389 (1973); *Wolfe v. Turner*, 267 Md. 646, 653–54, 299 A.2d 106 (1973); Stiller and Redden, "Statutory Reform in the Administration of Estates of Maryland Decedents, Minors and Incompetents," 29 Mᴅ. L.Rᴇᴠ. 85 (1969). Implicit in the discussion in *Wolfe v. Turner*, 267 Md. at 657–58, 299 A.2d 106, is the need for the Orphans' Court to be able to look at a total figure, so that it can assess that total in its relation to value of the estate:

> [T]he commissions allowed a personal representative and the fee allowed his counsel should be considered together by the orphans' court. Had he disclosed this in this petition, *the revelation that total expenses of administering a $43,000.00 estate would amount to $9,700.00 could well have been regarded as unreasonable or unfair.*

(Emphasis supplied).

With respect to attorneys' fees, Mr. Renner is an attorney and he, as Special Administrator, employed his own legal services, as well as those of three other attorneys, all associated with the law firm of Nolan, Plumhoff & Williams, Chartered. To every succeeding petition for payment, the appellants countered with timely exceptions. The ultimate amount being requested is $89,260.50 in counsel fees and $4,516.86 for the recovery of costs.

The most recent statement of the value of the estate (as of April 22, 2005) puts its value at $261,970.58. The combined fee petitions currently pending request legal fees and costs amounting to $123,395.40. That cost is for the fees incurred by the caveatees. The caveators have yet to be heard from.[8]

---

8. Those legal services, of course, were engaged by private litigants rather than by the agent of the estate, either on behalf of the estate or

Any fees that may ultimately be owing to Gerard Wittstadt for his less hectic tenure as successor Personal Representative have not yet been factored into the bottom-line figure. Nor have any claims for fees engendered in pursuing or in opposing this present appeal.[9] If truth is not stranger than Dickensian fiction, it is at least as strange.

There seems to be a paradox at work. How cost effective is it to accrue new fees today in order to litigate old fees from yesterday?[10] And what of the fact that as of tomorrow, today will have become tomorrow's yesterday? When does such a spiraling cycle come to an end?[11] Will it only be when the cupboard is bare?

---

on behalf of the administrator. See, however, *Clark v. Rolfe,* 279 Md. 301, 304–08, 368 A.2d 463 (1977). But see *Gradman v. Brown,* 183 Md. 634, 39 A.2d 808 (1944).

**9.** The attorneys for neither the appellants nor the appellees, however, were engaged by the Personal Representative, Mr. Wittstadt, on behalf of the estate, and the estate would appear to be spared these expenses.

**10.** When the Orphans' Court is finally able to consider the merits of the fee petitions in this case, it may, indeed, decide to consider the cost effectiveness of some of the fees incurred. In *Peterson v. Orphans' Court,* 160 Md.App. 137, 862 A.2d 1050 (2004), the Orphans' Court, considering a fee petition pursuant to Trusts and Estates Article, § 7–602, cut a requested fee from $4,269 to $1,423.25. While not challenging in any way the reasonableness of the charges, the Orphans' Court challenged the cost effectiveness of the litigation itself.

"[T]he Orphans' Court properly awarded an attorneys' fee and Court costs of $1,423.25 in light of the fact that *the litigation [,] while necessary to recover a debt due, was not cost effective.*"

160 Md.App. at 172, 862 A.2d 1050 (emphasis supplied).

Judge Hollander's opinion first noted that among the "principal elements to be considered ... in determining the reasonableness of an award of attorney's fees" are "the importance of the question [and] the benefit to the estate." 160 Md.App. at 175, 862 A.2d 1050. In then affirming the decision of the Orphans' Court, Judge Hollander stressed that court's reliance on cost effectiveness.

Based on the foregoing, we perceive neither error nor abuse of discretion in the court's award of $1,423.25 in additional attorney's fees. *It is clear that the court considered the cost effectiveness of the additional litigation.*

160 Md.App. at 176 (emphasis supplied).

**11.** It may well be, however, that all of the fee petitions are already in and all that remains to be done is for the Orphans' Court to consider

In any event, the scheduled hearing of February 16, 2005, on the fee petitions did not reach the ultimate merits. On January 27, 2005, the appellants had sent a letter to the Orphans' Court, suggesting that "there appears to be a fundamental, threshold issue of law that will need to be heard and decided before the other fee related issues are reached." The letter posed the legal question:

As a matter of Maryland law, *does* a Personal Representative, acting with only the powers of a Special Administrator, or *a Special Administrator* appointed by the Court, *have the legal authority to engage in litigation* involving the Estate and to incur attorneys' fees and expenses, *payable by* or from *the Estate*, without first filing an appropriate petition with the Court under ET § 6–403 and *without first obtaining an order of court authorizing those activities?*

(Emphasis supplied).

The appellants followed up that letter with an oral motion to dismiss the two petitions for counsel fees. At the conclusion of the February 16 hearing, the Orphans' Court denied that motion to dismiss. The court gave the following opinion from the bench.

This court finds that *Section 7–603 applies to the situation of a personal representative acting with the powers of a special administrator or a special administrator. While it is an accepted practice for* a personal representative acting with the powers of a special administrator or *a special administrator to file a petition* with the Orphans' Court *for authority to retain counsel to defend against the caveat,* the court holds that *it is not a requirement* and unnecessary in light of Section 7–603.

Ultimately the interests of an interested person in an estate are protected by application of Section 7–602, which requires the filing of a petition for counsel fees with the

the two fee petitions now before us. If that be so, it is "a consummation devoutly to be wished." *Hamlet,* III, i., 64.

court prior to the payment of any counsel fees out of estate assets.

*The court has the responsibility of determining whether the personal representative,* who in all cases involving a caveat would be limited to the powers of a special administrator, or a special administrator, *acted in good faith and with just cause in defending the will in light of the totality of the circumstances.*

Furthermore, *to the extent that this court signed the order* dated October 10th, 2001, transmitting issues to the Circuit Court, *which specifically designated Mr. Renner* as special administrator *as defendant,* this court holds that *it implicitly granted Mr. Renner the authority to retain counsel for the defense of the caveat proceedings.*

Consequently, this court shall deny the oral motion made by Mr. Barnes on behalf of his clients to dismiss the petitions for counsel fees filed by Mr. Renner and Mr. Rybczynski respectively on the grounds that the personal representatives then acting with the powers of a special administrator failed to file a petition for authority to retain counsel.

(Emphasis supplied).

The court then scheduled a further hearing on the merits of the fee petitions for March 11, 2005. On March 2, however, the appellants filed a Petition For the Transmission of [12] Issues of Fact to the Circuit Court. The motion recited the pendency of the "petition for the award and allowance of attorneys' fees, expenses and costs incurred in connection with or related to the caveat proceedings" and further represented that "certain issues of fact will need to be determined for this Court to enter a proper order under applicable law." On April 6, 2005, the Orphans' Court denied that Petition for the Transmission of Issues.

On May 3, the appellants filed this appeal from both 1) the April 6, 2005 order, denying the Petition to Transmit Issues; and 2) the February 16, 2005 order, denying the motion to dismiss the fee petitions.

## The Contentions Before Us

For convenience in handling, we are reshaping the appellants' three contentions into two. As reshaped, they are:

1. The Orphans' Court erroneously, on February 16, 2005, denied the appellants' motion to dismiss the two fee petitions because the respective special administrators had not obtained authorization from the Orphans' Court to engage in litigation as required by Estates and Trusts Article, § 6-403.

2. The Orphans' Court erroneously, on April 6, 2005, denied the appellants' request to transmit proposed issues to a circuit court jury for fact-finding.

Reluctantly, because of the time and expense involved, we must dismiss the appeal, in both of its aspects, as not properly before us. The appeal from the February 16, 2005 order is not properly before us because it is premature. The appeal from the April 6, 2005, order is not properly before us because it attempts to challenge a non-appealable order.

## I. The Appealability of the February 16 Order

In assessing threshold appealability, we will look first at the contention based on the February 16, 2005 order in a vacuum. If we find that it is not immediately appealable in its own right, we will then turn to the question of whether it acquires some enhanced eligibility for immediate appeal because of its appellate traveling companion.

### A. A Plausible Argument, When Ripe

Even as we are putting on hold the merits of the February 16 order denying the appellants' motion to have the two fee petitions dismissed, we are not suggesting for a moment that the appellants have not raised a very plausible argument. It is apparently one of first impression in Maryland and is deserving of serious appellate consideration. The argument is based on the statutory distinction in the Estates and Trusts Article between a personal representative and a special administrator. Although the linguistic distinction is frequently hon-

ored more in the breach than in the observance (and this case is a glaring example of such laxity), it may nonetheless be a distinction of critical importance in terms of the respective powers and authorities of the two functions.

Title 6 deals with the position of a personal representative, generally and Title 7 spells out the duties and the authority of a personal representative. Subtitle 4 of Title 6 deals expressly with the closely related, but by no means identical, position of a special administrator. § 6–401(a) provides for the appointment of a special administrator.

Upon the filing of a petition by an interested party, a creditor, or the register, or upon the motion of the court, *a special administrator may be appointed by the court* whenever it is necessary to protect property prior to the appointment and qualification of a personal representative or *upon the termination of appointment of a personal representative* and prior to the appointment of a successor personal representative.

(Emphasis supplied).

 Section 6–307 provides that, upon a request for judicial probate, the status and authority of a previously appointed personal representative is scaled back to the more limited one of a special administrator. That section provides, in pertinent part:

(a) *General.*—(1) *The appointment of a personal representative* who has been appointed by administrative probate *is terminated by a timely request for judicial probate.*

(2) The validity of an act performed by the person as personal representative is not affected by this termination.

(b) *Interim powers.*—Subject to an order in the proceeding for judicial probate, *a personal representative appointed previously has the powers and duties of a special administrator* until the appointment of a personal representative in the judicial probate proceeding.

(Emphasis supplied). And see *Carrick v. Henley,* 44 Md.App. 124, 125–26, 407 A.2d 765 (1979).

The reason for the diminution of the agent's authority is self-evident. In the controversy-free environment of administrative probate, the personal representative and the heirs are presumptively one happy family, working toward a common goal. Governmental (judicial) supervision of the process can be relatively minimal, simply requiring that some basic rules be followed and that appropriate costs be paid.

When the process downshifts into the more combatic mode of judicial probate, however, the supervisory reins are pulled far tighter. A caveat may pit one group of expectant beneficiaries against another, and the fear frequently arises that the administrator of the estate may be favoring one group against the other or even favoring his own interests against them both. In an atmosphere thus rife with confrontation and the possibly hair-trigger outbreak of conflict, the Orphans' Court understandably circumscribes the administrator's discretionary authority and intervenes more actively. An erstwhile personal representative will be constrained to act with the more limited authority of a special administrator, or he may simply be replaced by a court-appointed special administrator. *Carrick v. Henley*, 44 Md.App. 124, 131, 407 A.2d 765 (1979) ("[T]he request for judicial probate automatically terminated the administrative probate previously granted and no grounds for his removal were necessary.").

■ The legislative scheme of Titles 6 and 7 in combination makes very clear the difference between the powers of a personal representative and those of a special administrator. Title 7, as we have mentioned, catalogues the duties and the powers of a personal representative. By contrast, § 6–403 confines the duties and powers of a special administrator to some, but not to all, of those entrusted to a personal representative. That section provides:

A special administrator shall collect, manage, and preserve property and account to the personal representative upon his appointment. *A special administrator shall assume all duties* unperformed by a personal representative *imposed under Subtitles 2, 3, and 5 of Title 7,* and has all

powers necessary to collect, manage, and preserve property. *In addition, a special administrator has the other powers designated from time to time by court order.*

(Emphasis supplied).

Significantly for the argument advanced by the appellants on February 16, the conferring of duties and powers on the special administrator is confined to those spelled out in Subtitles 2, 3, and 5 of Title 7 and does not include those conferred by Subtitle 4. The deliberate legislative omission of Subtitle 4 from the list of duties and powers conferred on a special administrator cannot be blithely ignored. It is only by virtue of Subtitle 4, specifically by § 7–401(y), that a personal representative is expressly authorized to engage in litigation and implicitly to incur legal fees to that end.

(y) *Prosecute or defend litigation.*—He may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted.

Not having been granted any such inherent power, a special administrator would presumably have to rely on the granting of "other powers designated from time to time by court order" pursuant to § 6–403.

The thrust of the appellants' argument is that Charles Kresslein, Jr., when he incurred legal fees for the defense of his incumbency as special administrator—at the April 7, 1998 hearing before the Orphans' Court; in the abortive appeal of May 7, 1998 to the circuit court; and in the first appeal to this Court—was only empowered to act as Special Administrator and not as full-fledged Personal Representative. The other application of the argument is that Thomas Renner, when he incurred legal fees in defending the ostensible Will of July 1, 1996 against the caveat, was only Special Administrator and not Personal Representative. The argument is that neither Charles Kresslein, Jr. nor Thomas Renner possessed the inherent authority under § 7–401(y) to "prosecute or defend

litigation" and that neither of them sought such authority from the Orphans' Court pursuant to § 6–403.[12]

## B. What Is a Final Judgment From an Orphans' Court?

■ We are not suggesting that this is not a very cogent argument. Advance review by the Orphans' Court of the decisions might have prevented the expenditure of excessive time and money on ancillary questions of little merit and with small chance of success. When, however, the Orphans' Court on February 16, 2005 denied the motion to dismiss that was based upon this argument, that denial of the motion was quintessentially in the nature of an interlocutory order and not a final judgment.

Courts and Judicial Proceedings Article, § 12–501(a) squarely provides:

> A party may appeal to the Court of Special Appeals from a final judgment of an orphans' court.

(Emphasis supplied).

In *Hall v. Coates,* 62 Md.App. 252, 255–56, 489 A.2d 41 (1985), Judge William Adkins thoroughly traced the legislative history of § 12–501 back to the 1973 code revision made by Ch. 2, Acts of 1973 (1st special session).[13] He further pointed out, with respect to the section's earlier pedigree, that "the only changes [that were] made [were] in style," and that the

---

12. With respect to Mr. Renner, the decision of the Orphans' Court on February 16, 2005, that it had "implicitly granted [him] the authority to retain counsel for the defense of the caveat proceedings," would relieve him of any charge of having acted in bad faith within the contemplation of § 7–603. It might remain to be considered whether his decision to conduct a defense produced a "benefit to the estate" within the contemplation of § 7–401(y).

13. It was the code revision of 1973 that first enacted what is now the Courts and Judicial Proceedings Article. Title 12 thereof deals with appeals and replaced what had been Article 5 of the 1957 Maryland Code. Article 5, § 9 had dealt specifically with appeals from decisions of an orphans' court. See *Wall v. Heller,* 61 Md.App. 314, 324–25, 486 A.2d 764 (1985).

new section "was not intended to alter prior substantive law in this area."

That language has been interpreted as providing "that the appeals shall be taken only from *final* orders or decisions [of orphans' courts], those actually settling the rights of the parties."

62 Md.App. at 255, 489 A.2d 41 (emphasis and brackets in original).

In looking at the overall organizational framework of Title 12, dealing with "Appeals, Certiorari, and Certification of Questions," Subtitle 1, consisting only of § 12–101, provides a list of five not always helpful definitions.[14] Subtitle 3 covers the "Review of Decisions of Trial Courts of General Jurisdiction." Section 12–301 deals with the right to appeal from final judgments generally, § 12–302 deals with certain exceptions thereto, and § 12–303 permits appeals from a limited list of "certain interlocutory orders." Subtitle 5 deals distinctly with the "Review of Decisions of Orphans' Courts." Section 12–501 covers an "Appeal to Court of Special Appeals" from a "final judgment of an orphans' court," and § 12–502 covers an "Appeal to circuit court" from a "final judgment of an orphans' court." Subtitle 5 does not even mention the subject of interlocutory orders.

Just as Subtitle 3 and Subtitle 5 provide distinct requirements for appealability from decisions of 1) a court of general

---

**14.** Section 12–101(f), defining "final judgment," provides what well may be the most absurd example of circular reasoning in the entire corpus of Maryland law.

*"Final judgment" means a judgment,* decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, *from which an appeal,* application for leave to appeal, or petition for certiorari *may be taken.*

(Emphasis supplied).

That definition could have been written by Lewis Carroll. It's a tautology. The basic rule is that an appeal may be taken only from a final judgment. "Final judgment" is then defined as a judgment from which an appeal may be taken. The only thing sillier than that definition is a judge or lawyer who quotes § 12–101(f) as if it actually said something.

jurisdiction and 2) an orphans' court, their respective bodies of supporting caselaw provide radically different definitions of what is an appealable "final judgment." The drawing of any analogy, therefore, between § 12–301 and § 12–501 is treacherous in the extreme, as is the citing of caselaw from the one body of law in the context of the other.

In *Hegmon v. Novak,* 130 Md.App. 703, 747 A.2d 772 (2000), Judge Sally Adkins referred to what has become § 12–501's treatment of a final judgment as "this unusual definition of a 'final judgment,'" 130 Md.App. at 709, 747 A.2d 772. She there highlighted the critical distinction between radically different definitions.

> We would agree with appellant's argument *if the criteria for a final judgment in the context of an appeal* from an order transmitting issues *from an orphans' court were the same as that for other orders.* The Court of Appeals has made clear, however, that *it is not.*
>
> *"Finality" for purposes of an appeal from an orphans' court* transmittal of issues *assumes a different meaning than any other final judgement.*

130 Md.App. at 708–09, 747 A.2d 772 (emphasis supplied).

On the one hand, the definitive statement as to what is a "final judgment" in a court of general jurisdiction is that articulated by Judge Wilner (specially assigned) in *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767 (1989):

> If a ruling of the court is *to constitute a final judgment, it must have at least three attributes:* (1) *it must be intended by the court as an unqualified, final disposition of the matter in controversy,* (2) unless the court properly acts pursuant to Md. Rule 2–602(b), *it must adjudicate or complete the adjudication of all claims against all parties,* and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601.

With exceptions not relevant here, a ruling of a circuit court is not appealable unless it constitutes a final judgment. To have the attribute of finality, *the ruling must be so final as either to determine and conclude the rights*

*involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding.*

(Emphasis supplied).

By contrast, the standard definition of what is a "final judgment" from an orphans' court is taken from *Schlossberg v. Schlossberg,* 275 Md. 600, 612, 343 A.2d 234 (1975):

[T]he "final judgment" of an Orphans' Court are those judgments, orders, decisions, etc. which, in caveat proceedings, finally determine the proper parties, the issues to be tried and the sending of those issues to a court of law.[15]

An earlier definition from *Safe Deposit & Trust Co. v. Hanna,* 159 Md. 452, 455, 150 A. 870 (1930), had been:

The order here appealed from determined the proper parties to the caveat proceeding, determined the issues to be tried, and directed that they be sent to a court of law.

See also *Hegmon v. Novak,* 130 Md.App. at 709–10, 747 A.2d 772.

A representative list of "final judgments" within the contemplation of probate law, each example footnoted by its supporting caselaw, can be found at 1 Philip L. Sykes, *Probate Law and Practice* (1956),[16] § 243, pp. 251–52.

---

**15.** *Schlossberg v. Schlossberg,* 275 Md. at 612 n. 8, 343 A.2d 234, also pointed out that Maryland Rule 2–602 (former Rule 605) is not applicable to the judgments of an orphans' court.

Because of the nature of such proceedings Maryland Rule [2–602] which relates to judgments upon multiple claims ... is inapplicable.

**16.** This two-volume work by Philip Sykes has deservedly been considered the Bible of Maryland probate law for fifty years.

Very commendably filling a gap that is now 50 years wide, Albert W. Northrop and Robert A. Schmuhl, *Decedents' Estates in Maryland* (1994) is an invaluable supplement, providing a thorough and painstaking coverage of both 1) the caselaw of the last half a century and 2) the sweeping revision of probate law in Maryland by the General Assembly in 1965, leading ultimately to its codification in the new (as of 1974) Estates and Trusts Article. This newer work also covers Title 6 of the Maryland Rules, "Settlement of Decedents' Estates," which was adopted by the Court of Appeals in 1990 and first became effective on January 1, 1991.

In general an appeal will lie from any decision of the Orphans' Court which transcends its restricted powers and from its act done in contravention of a statute. It has been held that an appeal may be taken from an order appointing an administrator ad litem, from an order revoking the probate of a will, from an order revoking letters, from an order refusing to revoke letters, from an order dismissing a petition asking that the Court refuse to grant letters testamentary or of administration on the ground of the decedent's non residence, from an order granting or refusing to grant issues, from the ratification of a separate administration account on an appeal by a co-executor and a distributee, from an order relating to the allowance of counsel fees, and from an order directing the mode of distribution of a decedent's estate among his creditors.

As is apparent at a glance, the two definitions of "final judgment" are not even in the same ballpark, and the careful practitioner should scrupulously confine each to its own unique arena. Upon reflection, moreover, the distinction between the two makes eminently good sense. The litigation that produces a judgment in a court of general jurisdiction is, in its deepest ontological essence, adjudicative by its very nature. The final judgment of a court is the thing being sought from the outset of the action. It is the purpose of the litigants that the suit proceed to final judgment, and it is appropriate to let the appeal abide the final outcome of that litigation, so that all loose ends can be tied up in a single omnibus appeal.

The administration of an estate, by contrast, is a very different phenomenon. Ideally, as in administrative probate, there may be nothing that a judge need ever adjudicate. Even when the endeavor turns to judicial probate, moreover, the need for judicial adjudicative intervention is frequently intermittent and only on a very *ad hoc* basis. For much of its course, the process is allowed to go its own way outside the courtroom. Adjudication is sometimes an incident of the process, but it is by no means its generative purpose.

Because adjudicative decisions as to bits and pieces of the larger enterprise may be the only court judgments ever rendered, however, there is not the same expectation of an apocalyptic last judgment. Appeals from some, though not from all, of the adjudicative decisions taken along the way may be necessary in this fundamentally different legal environment. The two arenas are simply not the same.

Even by the more latitudinarian definition in the lexicon of probate law, however, it is clear that the Orphans' Court's decision to deny the appellants' motion to dismiss the fee petitions was not a final judgment. Its effect was quintessentially interlocutory. But for this appeal, the Orphans' Court would have proceeded forthwith to conduct a hearing on the merits of the fee petitions. Once awards are made, or denied, those awards will, in the fullness of time, be appealed to us as proper final judgments. The argument the appellants now make on the merits of the fee petitions may be made at that time and will not in any way be compromised by intervening events.

### C. There Are Still Other Arrows in the Appellants' Quiver

The Orphans' Court decision of February 16, 2005, moreover, was not fatal to the appellants' challenge to the fee petitions. That decision warded off only a single arrow in the enfilade of arguments the appellants will certainly be aiming at the fee petitions. Above and beyond any claim that the decisions of two successive special administrators to hire attorneys, without prior Orphans' Court approval, were *ultra vires*, an attack on a fee petition is routinely two-tiered in two other respects.

One may, of course, challenge a requested fee purely by the norms and standards of the legal workplace—the charge per billable hour, the number of billable hours, the quality of the work produced. This is the standard charge that the fee is excessive in amount. The attack in such a case is focused more on the lawyer than on the client.

■ On the other hand, or in addition, there may be a challenge of a very different nature. It is a challenge that focuses on the client rather than on the lawyer. It may challenge both the judgment of the client and the motive of the client—particularly when the client is a personal representative or special administrator—in engaging a lawyer in the first place for certain litigational purposes. It is settled law that, although the decision to award a fee and the amount of the fee are in the discretion of the Orphans' Court, an appeal may be taken from an abuse of that discretion. *Wright v. Nuttle,* 267 Md. 698, 700–01, 298 A.2d 389 (1973); *Wolfe v. Turner,* 267 Md. at 653, 299 A.2d 106; *Lusby v. Nethken,* 262 Md. 584, 586, 278 A.2d 552 (1971).

2 Sykes, *Probate Law and Practice,* § 895, p. 54, makes mention of the two-tiered nature of the inquiry.

> The action of the Orphans' Court in allowing fees may be reviewed on appeal; *first, as to the authority to make such allowance* in the particular case; *second, as to the reasonableness of the fee* allowed.

(Emphasis supplied).

The list of factors to be considered set out in *Wolfe v. Turner,* 267 Md. 646, 653, 299 A.2d 106 (1973), seems to embrace both 1) the work of the attorney *per se* and also 2) the decision of the client to engage an attorney for certain tasks.

> The principal elements to be considered in determining reasonableness are the amount involved, the character and extent of the services, the time employed, *the importance of the question, the benefit to the estate* and the customary charges made for similar services.

(Emphasis supplied). See also *Riddleberger v. Goeller,* 263 Md. 44, 52–58, 282 A.2d 101 (1971); *American Jewish Joint Distribution Committee v. Eisenberg,* 194 Md. 193, 200, 70 A.2d 40 (1949).

### D. The Question Is Not So Much What Shall Be Paid, But Who Shall Pay?

The consistent and unmistakable thrust of the appellants' challenges to fees in this case has not been aimed primarily at the work product, quantitative or qualitative, produced by the respective law offices. The attack, at times vigorous, has been upon 1) the decision of Special Administrator Charles Kresslein, Jr., to engage counsel to defend his incumbency in that position; and 2) the decision of Special Administrator Thomas Renner to engage counsel to defend the purported Will of July 1, 1996 against caveat.

On the other hand, the appellants do take serious exception to the legal bill of $81,000 for the defense against the caveat. That fee petition asked for an amount that represented almost one-third of the total value of the estate for the unsuccessful defense against caveat of the purported Will of July 1, 1996, that was ultimately declared to be "null and void." As was stated by *Wolfe v. Turner*, 267 Md. at 658–59, 299 A.2d 106, "[T]he appropriateness of a counsel fee cannot be determined by simple arithmetic. This is an area where adherence to standards, and not reliance on mere numbers, must be the controlling factor."

The primary thrust of the appellants' argument, however, is not that the two law firms are not entitled to be paid, but that they are not entitled to be paid by the estate. This question of who shall pay was the issue raised in *Wright v. Nuttle*, 267 Md. 698, 699, 298 A.2d 389 (1973):

> [N]either the reasonableness of the hourly rate nor the amount of the charge is directly questioned. Rather, *the question is, shall the charge be paid entirely by the estate* or partly or wholly by the residuary legatee?

(Emphasis supplied).

In *Riddleberger v. Goeller*, 263 Md. at 58, 282 A.2d 101, the Court of Appeals explained that the appellee in that case *confuses the difference between the fee which may be allowable from an estate with the total compensation which may well be due counsel for his services* rendered, since the

allowance of a fee in an estate in no way precludes counsel from charging a fee to the personal representative.

(Emphasis supplied). See also *Wolfe v. Turner*, 267 Md. at 658, 299 A.2d 106; *American Jewish Joint Distribution Committee v. Eisenberg*, 194 Md. at 202, 70 A.2d 40.

When this question of the fee petitions is finally before the Orphans' Court for consideration, that court will be facing a multi-layered bundle of intertwined and overlapping issues. There are two distinct petitions for the payment of legal fees to two different law firms. The first petition was submitted by the lawyers themselves, pursuant to Estates and Trusts Article, § 7–602. The second petition was submitted by the Special Administrator of the estate, also pursuant to § 7–602. The first petition is for legal services that were engaged by Charles Kresslein Jr., who was also a legatee under the Will that he had prepared and submitted for probate. The second petition is for legal services that were engaged by Thomas Renner, who was an independent appointee of the Orphans' Court. The first petition is for legal services rendered in defending the incumbency of Mr. Kresslein as Special Administrator. The second petition is significantly, but not entirely, for legal services rendered in defending the purported July 1, 1996 Will against caveat. Mr. Renner had been directed to defend against the caveat by the Orphans' Court. The sets of circumstances are both sufficiently distinct and sufficiently complex to preclude any simplistic resolution of the exceptions to the petitions.

Because the attack in both cases will, *inter alia*, be upon the judgments and/or the motives of the Special Administrators in engaging counsel 1) to defend the Kresslein incumbency and 2) to defend the purported Will of July 1, 1996 against caveat, § 7–603 may become involved. It provides:

When a personal representative or person nominated as personal representative defends or prosecutes a proceeding *in good faith and with just cause,* he shall be entitled to

receive his necessary expenses and disbursements from the estate regardless of the outcome of the proceedings.

(Emphasis supplied).

■ Battle may be joined, of course, over both 1) good faith and 2) just cause. At such hearing, all interested parties will be permitted the full opportunity to argue and to offer evidence on the reasonableness of the fee petitions. *Geesey v. Geesey,* 94 Md. 371, 374, 51 A. 36 (1902); *Miller v. Gehr,* 91 Md. 709, 715, 47 A. 1032 (1900).

Heavily involved in any resolution on the merits will be a close examination of *Piper Rudnick LLP v. Hartz,* 386 Md. 201, 872 A.2d 58 (2005); *Fields v. Mersack,* 83 Md.App. 649, 577 A.2d 376 (1990); and *National Wildlife Federation v. Foster,* 83 Md.App. 484, 575 A.2d 776 (1990). In *National Wildlife Federation v. Foster,* this Court was, to be sure, considering the reasonableness of a personal representative's request for *interim* attorney's fees, a subject slightly different, at least in terms of tense, from that now before us. The opinion nonetheless offers guidance as to how to measure the "good faith" and "just cause" required of a personal representative by § 7–603. When it comes to the question of whether the representative of an estate acted with "good faith" and "just cause" in undertaking to prosecute or defend a particular action, the likelihood of success will have a significant bearing on that issue.

■ Whether *actually looking forward,* as in the *National Wildlife* case, or *hypothetically looking forward,* as in the case at hand, the Orphans' Court must attempt to assess the likelihood that a legal action will succeed, because that tactical assessment is strong evidence of the representative's good faith and just cause in pursuing the action.

The first, and most important, factor is *whether there is prima facie evidence that the personal representative will succeed on the merits and thus is defending or prosecuting the underlying action in good faith and with just cause.* Like the judge in an interlocutory injunction hearing, the

orphans' court must attempt to predict the outcome of the trial on the merits.

83 Md.App. at 497, 575 A.2d 776 (emphasis supplied).

Judge Alpert's opinion went on to explain why pursuing litigation with little chance of success is evidence, albeit not *per se* conclusive evidence, of bad faith and the absence of just cause.

[W]e are mindful of the harm that could result if a personal representative is permitted to use the estate's assets to defend or prosecute a claim in bad faith and without just cause. *Not only might the estate be dissipated and the legatees unable to recover the money paid in attorneys' fees from the personal representative* at the conclusion of the underlying litigation, but *such meritless litigation also causes an unnecessary drain on the judicial system.*

83 Md.App. at 498, 575 A.2d 776 (emphasis supplied).

There are echoes of the present case in *Fields v. Mersack, supra,* 83 Md.App. 649, 577 A.2d 376, a case that considered whether a personal representative who hired an attorney to defend a caveat had acted, pursuant to § 7–603, in good faith and with just cause. The wife of the deceased in that case was both the personal representative and the sole beneficiary under a will. The will was successfully caveated by the personal representative's step-daughter. A jury found that the will had been procured by undue influence. The personal representative subsequently filed a petition for counsel fees incurred in defending against the caveat. The step-daughter successfully excepted to the payment of such a fee, and the personal representative appealed.

Writing for this Court, Judge Bell (now chief Judge of the Court of Appeals) quoted § 7–603 and then set out the opinion's major premise.

The plain language of the statute makes clear, and the parties agree, that *a personal representative may not receive* "*necessary expenses* and disbursements *from the es-*

*tate" unless he* or she *"defends* or prosecutes *a proceeding in good faith and with just cause."*

83 Md.App. at 654, 577 A.2d 376 (emphasis supplied).

After concluding that the personal representative had, indeed, been the wielder of the undue influence, this Court had to consider the impact of the undue influence finding on the issue of good faith and just cause.

> Implicit in appellant's position is that a jury finding of undue influence does not preclude, as a matter of law, payment of a personal representative's expenses out of the estate. Appellee's position is explicit in its assertion that such a finding does preclude, as a matter of law, payment of such expenses from the estate. No Maryland court has had an occasion to address this point.

83 Md.App. at 656, 577 A.2d 376.

Surveying the caselaw from around the country, Judge Bell found that two basic approaches are employed. The discretionary approach permits an orphans' court to find such a connection on a case-by-case basis. The *per se* approach concludes that such a connection exists as a matter of law.

> We opted for the discretionary rule.

> The fundamental difference between these lines of cases is that, in the latter, a *per se* rule is enunciated, while in the former a discretionary rule is explicated. *We are persuaded that the discretionary rule is the better rule.*

83 Md.App. at 658, 577 A.2d 376 (emphasis supplied).

■ Although the present case is not on all fours with *Fields v. Mersack,* the import of that opinion is that the Orphans' Court, when determining whether Mr. Kresslein acted in good faith and with just cause in engaging counsel to defend his incumbency as special administrator, may consider, as part of "the totality of circumstances," such things as its own findings of April 9, 1998, and the findings of the circuit court jury of June 24, 2004.

> *[A] trial judge* presented with a petition for costs and attorney's fees filed by a personal representative, whom a

jury has found has exerted undue influence on the decedent, *must determine,* nevertheless, *whether the personal representative acted in good faith and with just cause in defending the will. That determination must be made in light of the totality of the circumstances, including the jury's finding, and by weighing all the evidence.* The trial judge may not import bad faith from the jury's finding alone.

83 Md.App. at 659–60, 577 A.2d 376 (emphasis supplied).

### E. Section 7–602 and § 7–603 Distinguished

The scholarly and painstakingly thorough opinion of Judge Raker in *Piper Rudnick v. Hartz* draws a careful line between § 7–602 and § 7–603. Section 7–602 requires that the legal services, to be reimbursable from the estate, shall have been rendered "for the protection or benefit of the estate," [17] whereas § 7–603 "requires only that the personal representative acted 'in good faith and with just cause.' " [18] 386 Md. at 217, 872 A.2d 58. In tracing at length the legislative histories of the two sections, the opinion makes it clear that § 7–602 focuses primarily on the attorney and the legal fees, whereas § 7–603 "covers a personal representative's expenses in defending or prosecuting a proceeding." 386 Md. at 223, 872 A.2d 58. There is a decided overlap, but the respective centers of gravity are not the same. The two fee petitions in this case were submitted pursuant to § 7–602.

Judge Raker's opinion then carefully pointed out that its analysis was only with respect to § 7–603 and not with respect to § 7–602.

As the courts below ruled based on § 7–603, we first consider whether Goldman met the requirements of § 7–

---

**17.** The language comes from § 7–401(y), which provides that a personal representative "may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction *for the protection or benefit of the estate.*" (Emphasis supplied).

**18.** Without any elaboration, *Piper Rudnick* cryptically suggests, 386 Md. at 218, 872 A.2d 58, that § 7–603 also requires that "the expenses and disbursements must be 'necessary.' "

603. Since we conclude that Goldman is entitled to receive his expenses and disbursements from the estate, *we need not consider whether Piper Rudnick should have been reimbursed under § 7–602.*

386 Md. at 217 n. 7, 872 A.2d 58 (emphasis supplied).

In *Piper Rudnick,* a personal representative who successfully defended against an attempt to have him removed from that office was entitled, under § 7–603, to be reimbursed for legal fees expended in that successful effort.[19]

Although doing so only in the context of distinguishing § 7–603 from § 7–602, Judge Raker, 386 Md. at 224–28, 872 A.2d 58, thoroughly traced the history, beginning in the early 1900's, of the "benefit to the estates" requirement. Although not a part of § 7–603, the "benefit to the estate" requirement is firmly embedded in § 7–602.

> *This conception that a "benefit to the estate" was required* from the statutory use of "legal services rendered" *endured* through the 1969 revision of Article 93 *in § 7–602—but not in § 7–603. . . .*

> *Contrary to § 7–602,* § 7–603 does not contain a "legal service rendered . . . to an estate" clause, and *no decision of this Court has held that the "benefit to the estate" rule was carried over to § 7–603.*

386 Md. at 227–28, 872 A.2d 58 (emphasis supplied).

■ The *Piper Rudnick* opinion also spelled out several procedural and evidentiary incidents that, we conclude, would apply to the consideration of the "benefit to the estate" requirement under § 7–602 as surely as *Piper Rudnick* held them to apply to the "good faith and just cause" requirement under § 7–603. One of them allocates the burden of proof.

---

**19.** By contrast, we will never know whether Mr. Kresslein's effort to defend his incumbency would or would not have been successful, for his resignation precluded a finding on the merits from ever being made. The decision of this Court of December 20, 1999, on the occasion of the first appeal, was only with respect to an interlocutory procedural matter and did not address the merits of Mr. Kresslein's incumbency.

It is the personal representative's burden to establish good faith and just cause.

386 Md. at 229, 872 A.2d 58.

■ Another points out that these are factual questions affecting the award of attorneys' fees that are to be determined by the Orphans' Court.

The existence of good faith and just cause is *a question of fact to be determined by the orphans' court* based upon all of the evidence.

386 Md. at 229–30, 872 A.2d 58 (emphasis supplied).

■ The third is that the legal outcome of the proceeding that led to the incurring of the legal fees is not *per se* dispositive of the antecedent question of "good faith," *e.g.*, in incurring the fee, but is nonetheless relevant evidence on that antecedent issue.

If the orphans' court concludes that the personal representative acted in good faith and with just cause, then the personal representative is entitled to his necessary expenses and disbursements "regardless of the outcome of the proceeding." *The orphans' court,* however, *may consider the outcome of the proceeding in its review of all the evidence to determine whether the personal representative acted in good faith and with just cause.*

386 Md. at 230, 872 A.2d 58 (emphasis supplied).

■ A final pertinent point made by *Piper Rudnick* is that the "benefit to the estate" requirement, albeit not an element of § 7–603, is a relevant factor in resolving a § 7–603 question. Judge Raker, 386 Md. at 231, 872 A.2d 58, posed the question.

While we hold that § 7–603 does not contain an independent "benefit to the estate" requirement, we consider whether "benefit to the estate" is a relevant factor for an orphans' court's determination of good faith and just cause.

After quoting at length and with approval the Arizona intermediate appellate decision of *In re Estate of Gordon,* 207 Ariz. 401, 87 P.3d 89, 94 (2004), Judge Raker concluded:

We agree and conclude that *while § 7–603 does not contain an independent "benefit to the estate" requirement, that concept is a factor to be considered in the objective inquiry into whether the personal representative acted in good faith and with just cause.*

A personal representative whose expenses are incurred in pursuit of his personal interest, rather than a substantial estate interest, is not acting to benefit the estate.

(Emphasis supplied).

Because the fee petitions in this case are pursuant to § 7–602, and because "benefit to the estate" is, therefore, a factor, a pertinent inquiry on the first fee petition may well be, "Of what benefit to the estate was the defense of Mr. Kresslein's incumbency as special administrator?" A pertinent inquiry on the second fee petition may well be, "Of what benefit to the estate was the unsuccessful defense against caveat of the purported Will of July 1, 1996?" A pertinent answer to the second question, of course, may be, "Mr. Renner made no decision in that regard. He simply did what he was directed to do by the Orphans' Court."

In any event, it is clear that the Orphans' Court's decision of February 16, 2005, which the appellants are now attempting to appeal, is but a small part of the total package that will have to be considered when the fee petitions finally come before the Orphans' Court on their merits. When final judgement is entered on those fee petitions, the current issue, no doubt along with others, will be ripe for appellate consideration.

## II. May a Non–Appealable Issue

### Piggyback on an Appealable Issue?

Both the appellants and the appellees chose to concentrate fire on the immediate appealability of the April 6, 2005 decision of the Orphans' Court to deny the appellants' request to transmit issues to the circuit court for fact-finding by a jury. Both parties neglected the distinct question of whether the decision of the Orphans' Court of February 16, 2005, denying

the appellants' motion to dismiss the petition for counsel fees, was itself immediately appealable.

■ The failure of the appellees to have raised an individualized challenge to the immediate appealability of the February 16, 2005 decision, however, is of no consequence. In *Canterbury Riding Condominium v. Chesapeake Investors, Inc.*, 66 Md.App. 635, 654, 505 A.2d 858 (1986), we dealt with this very question.

Despite the fact that neither side has questioned the jurisdiction of this Court to entertain this appeal, *we must, on our own motion, recognize our lack of jurisdiction.* Since, furthermore, jurisdiction cannot be conferred upon the Court by consent of the parties, we must dismiss the appeal.

(Emphasis supplied). See *Potter v. Bethesda Fire Dept., Inc.*, 302 Md. 281, 487 A.2d 288 (1985); *Diener Enterprises v. Miller*, 266 Md. 551, 295 A.2d 470 (1972).

■ In its own right, the decision of February 16, 2005, as we have now thoroughly analyzed, was clearly not immediately appealable. If that were all that was before us, the appeal would now be dismissed as premature without further discussion. That, however, is not all that is before us. The appellants are appealing two decisions. Assuming, purely *arguendo*, that the decision of April 6, concerning the transmission of issues, were immediately appealable, would that be of any avail to the appellants' companion effort to appeal the decision of February 16? May the one issue piggyback on the other all the way to Annapolis? We hold that it may not.

There is scant authority on the question of appellate piggybacking, and the issue never squarely arose in Maryland until 1973. In *Williams v. State*, 17 Md.App. 110, 299 A.2d 878 (1973), the denial of the Sixth Amendment right to a speedy trial was immediately appealable, but a challenge to the composition of the jury array was not. While appealing to this Court the speedy trial issue, the appellants in that case attempted to slip in through the backdoor the challenge to the jury array as well. The State moved to have the interloper dismissed.

In granting the motion to dismiss, this Court, speaking through Judge Scanlan, held that the appealability of each separate issue must be analyzed in a vacuum and that there are no two-for-the-price-of-one bargains on the appellate docket.

> *Nor can the order denying the challenge to the array be converted into an appealable order by virtue of the fact that it is joined with the appeal of an interlocutory order which is appealable,* that is, the trial court's ruling denying the motion for a speedy trial. *The precise point appears to be one of first impression in Maryland. At least two other States, however, have repudiated attempts to combine a nonappealable order with an appealable, interlocutory order.* To hold otherwise might presage the outbreak of a rash of spurious motions to dismiss for lack of a speedy trial filed solely for the calculated purpose of laying the ground work for an immediate appeal to which otherwise clearly nonappealable issues would be attached as companions.

> Judge Close's order denying the motion challenging the petit jury array was an interlocutory, nonappealable order. Accordingly, the State's motion to dismiss is granted.

17 Md.App. at 115, 299 A.2d 878 (emphasis supplied).

The two cases cited by *Williams v. State,* 17 Md.App. at 115, 299 A.2d 878, roundly rejected the tactic of attempting to smuggle a non-appealable issue aboard by coupling it with an appealable traveling companion. In *Bloomfield Royalty Corp. v. Carco Investments, Inc.,* 435 S.W.2d 178, 180 (Tex.Civ.App. 1968), the Texas Court of Civil Appeals insisted that each appellate issue carry its own passport.

> The right to appeal from an interlocutory order ... is purely statutory and embraces only the order provided for in the statutes.... An accompanying nonappealable interlocutory order is not made appealable by the fact that an appeal properly lies from an interlocutory injunction order.

> *An appeal from an order granting or refusing a temporary injunction may not be used as a vehicle by which to*

*convey to the appellate court for review other interlocutory orders which are not appealable.*

(Emphasis supplied).

In *Gordon v. Central Park Little Boys League*, 270 Ala. 311, 119 So.2d 23, 26 (1960), the Supreme Court of Alabama was equally dismissive of appellate stowaways.

An appeal will not lie from an order or decree overruling a motion to dismiss. *If no provision is made by law for an appeal from an interlocutory decree, such decree may not be assigned as error on appeal from another interlocutory decree.*

(Emphasis supplied).

The appellants' first contention, challenging the Order of the Orphans' Court of February 16, 2005, was an attempted appeal from a non-final judgment and must, therefore, be dismissed as not properly before this Court at this time.

## III. Appealability of the Order

### Denying Transmittal of Issues

After the Orphans' Court, on February 16, 2005, denied the appellants' motion to dismiss the fee petitions as a matter of law, the court scheduled March 11 as the date on which it would reconvene the hearing on the exceptions to the fee petitions.[20] On March 2, however, the appellants petitioned to have twelve issues of fact submitted to a circuit court jury.

---

**20.** There is a dispute between the parties as to whether the hearing on the exceptions to the fee petitions actually began on February 16, 2005, and was merely continued to March 11 or whether the actual hearing on the exceptions had not yet begun. The appellees invoke *Maynadier v. Armstrong*, 98 Md. 175, 180, 56 A. 357 (1903), as it held:

[W]hen that Court is actually engaged in the hearing of the question whether administrators are entitled to be allowed for such items as these, it might lead to dangerous practices if either party has the right to stop all proceedings in that Court and require issues to be sent to a Court of law.

Chief Judge of the Orphans' Court Theresa A. Lawler began the proceedings at 9:35 a.m. by announcing its purpose.

Essentially *the matters before us this morning involve the counsel fee petitions* that have been filed over the years in connection with this

In their appellate brief, the appellants now acknowledge "that the amount of any fees payable is not a proper subject for issues." In reply brief they reiterate, "Appellants do not dispute that the orphans' court has the ultimate authority to determine the *amount* of any attorneys' fees or expenses payable to Appellees." That quite correct acknowledgment indisputably eliminates four of the twelve issues from further consideration.

4. *Are the legal fees* and expenses of Edward R. Rybczynski, Esquire, *incurred by Charles J. Kresslein, Jr.,* in his capacity as Personal Representative of the Estate of Viola M. Uhl, deceased, acting with the powers and duties of a Special Administrator, *fair and reasonable* for the defense of the caveat and related proceedings instituted by Petitioners?

5. If the answer to question number 4 is "no", *what amount is fair and reasonable as attorneys' fees* and expenses for Kresslein's defense of the caveat and related proceedings instituted by Petitioners?

11. *Are the legal fees* and expenses *incurred by Thomas J. Renner,* in his capacity as Special Administrator, *fair*

---

estate. The estate has been open a very long time. There have been quite a few attorneys involved in the estate matters over the years, petitions have been filed, amended petitions have been filed, and *we are now at a point of having the responsibility of determining what counsel fees would be appropriate to be paid out of the estate.*
She concluded the proceedings for the day at 1:15 p.m.

At this point, *in light of the hour,* what the court would like to do is *we will hear the matter involving the actual exceptions to the petition* for counsel fees filed by Mr. Rybcznski and Mr. Renner *on March 11th,* 2005 at 9:30 so that *to the extent anyone here is involved in that issue, any witnesses, you are free to leave* and you may take a moment to go.
(Emphasis supplied). Would not this issue argued by the parties be the precisely same if the Orphans' Court had scheduled the next round (whatever it was) for February 17 instead of for March 11?

In the last analysis, however, our resolution of the question of the appealability of the denial of the petition to transmit issues does not depend on the question of whether the hearing on the fee petitions had actually begun.

*and reasonable* for the defense of the caveat proceedings instituted by Petitioners?

12. If the answer to question number 11 is "no", *what amount is fair and reasonable* as attorneys' fees and expenses for Renner's defense of the caveat and related proceedings instituted by Petitioners?

(Emphasis supplied).

██ And then there were eight. Four of the issues charge the respective special administrators with a breach of fiduciary duty.

2. *Did Charles J. Kresslein, Jr.,* as Personal Representative of the Estate of Viola M. Uhl, deceased, acting with the powers and duties of a Special Administrator, *breach his fiduciary duty to the Estate* by entering into an open-ended, hourly fee agreement with Edward B. Rybczynski, Esquire, for the defense of the caveat and related proceedings instituted by Petitioners?

6. *Did Thomas J. Renner,* in his capacity as the court appointed Special Administrator of the Estate of Viola M. Uhl, *breach his fiduciary duty to the Estate* by taking a partisan position in the caveat proceedings instituted by Petitioners?

7. *Did Thomas J. Renner,* in his capacity as the court appointed Special Administrator of the Estate of Viola M. Uhl, *breach his fiduciary duty to the Estate* by retaining his law partner, Robert L. Hanley, Jr., to render legal services to the Estate in the caveat proceedings filed by Petitioners?

8. *Did Thomas J. Renner,* in his capacity as the court appointed Special Administrator of the Estate of Viola M. Uhl, *breach his fiduciary duty to the Estate* by entering into an open-ended, hourly fee agreement with his own law firm and his law partner, Robert L. Hanley,

Jr., for the defense of the caveat proceedings instituted by Petitioners?

(Emphasis supplied).

A "breach of fiduciary duty" is a precise term of art. It is also a very serious accusation. It is no mere casual synonym or offhand reference to the absence of "good faith and just cause." In *Fidelity Trust Co. v. Barrett*, 186 Md. 483, 488–89, 47 A.2d 72 (1946), Judge Delaplaine made it very clear that to be an issue properly transmitted to the circuit court, the issue must be one that is squarely, not allusively or inferentially,[21] before the Orphans' Court.

Only questions of fact which are properly in issue between the parties in the orphans' court should be sent to a court of law for trial upon request of either party. *An issue cannot be made up in any way except upon affirmative averment on one side and denial thereof on the other. This collision of statement is its very substance and essence.*

(Emphasis supplied).

In *Kao v. Hsia*, 309 Md. 366, 374–75, 524 A.2d 70 (1987), Judge William Adkins thoroughly explicated the limitations that are imposed on the transmission of issues.

*An orphans' court may not send any issue of fact to a circuit court for determination.* . . . In *Myers v. Hart*, 248 Md. 443, 447, 237 A.2d 41, 44 (1968), we explained that

. . . It is essential, however, that *each issue meet [these] tests:* (1) Does the orphans' court have jurisdiction of the

---

21. Being "related to," "implied by," or "inferred from" is not enough. In *Hegmon v. Novak*, 130 Md.App. 703, 713, 747 A.2d 772 (2000), we summarized, in this regard, the decision of the Court of Appeals in *Elliott v. Maryland National Bank*, 291 Md. 69, 79, 432 A.2d 473 (1981).

The Court held that *"[t]he contention that certain* of the amended *grounds for caveat, such as undue influence, are related to and possibly implied or inferred by the original grounds* of the Caveat (lack of mental capacity) . . . *is without merit."* It characterized undue influence as a separate and distinct issue from lack of mental capacity. (Emphasis supplied). Getting close doesn't count, except in horseshoes.

subject? (2) *Is the question properly before the orphans' court?* (3) Is the issue relevant and material to the question before the orphans' court?

*These tests,* of course, *cannot be applied unless there are pleadings in the orphans' court (such as a petition to caveat and an answer thereto) which demonstrate the existence of a factual controversy,* that the controversy concerns a subject matter within the jurisdiction of the orphans' court, and that the remaining elements of the *Myers* test are met.

(Emphasis supplied).

The issue remaining before the Orphans' Court is that of two fee petitions and the exceptions thereto. The appropriate pleadings in which to look for the charge of a breach of fiduciary duty are the exceptions filed by the appellants. Nowhere in those exceptions, and nowhere in the record, do we find the subject of a breach of fiduciary duty raised as an issue before the Orphans' Court.

In *Nugent v. Wright,* 277 Md. 614, 356 A.2d 548 (1976), the personal representative of an estate appealed from a pair of issues that had been submitted to a jury at the request of a caveator. The caveator, who had raised a valid issue as to undue influence, sought, in a burst of rhetorical exuberance, to equate "undue influence" and "fraud" with the questions:

"(7) Was George Ainslie Nugent in a confidential relationship to Aldace Freeman Walker?"

"(8) If the answer to Issue No. 7 is 'yes', *was the paper* dated April 8, 1973, purported to be the Last Will and Testament of Aldace Freeman Walker, *procured by fraud or undue influence* exercised upon him by George Ainslie Nugent?"

277 Md. at 624–25, 356 A.2d 548 (emphasis supplied).

The Court of Appeals first set out the general rule for determining whether the issue of fraud was actually an issue before the Orphans' Court and where to look for it.

Issues involve questions of fact in dispute between the parties, *to be ascertained from the petition and answer.*

277 Md. at 619, 356 A.2d 548 (emphasis supplied).

In then reversing the decision of the Orphans' Court to have transmitted an issue charging fraud to a circuit court jury, the Court of Appeals held:

> *Mr. Nugent maintains that it was error to submit any issue regarding fraud, which was nowhere referred to in Mrs. Wright's petition, although undue influence was.* There is a clear cut distinction between the two, and *an issue framed on a subject not contested must not be submitted.* The court, therefore, erred in granting Issues (7) and (8) in the form submitted.

277 Md. at 625, 356 A.2d 548 (emphasis supplied).

A similar overreaching occurred in *Hegmon v. Novak.* The orphans' court transmitted to the circuit court an issue inquiring into the subject of undue influence. That issue was improperly transmitted because undue influence had not theretofore been alleged.

> *The petition* to caveat filed by appellee *asserted only two grounds* for challenging the will of Fishgrund: incapacity and improper attestation. *The third issue transmitted, undue influence, was not alleged in the petition.* Appellant contends, and we agree, that *the orphans' court could not transmit the third issue when there had been no allegation in the petition that undue influence had been exerted over the decedent.*

130 Md.App. at 713, 747 A.2d 772 (emphasis supplied).

 We think the four issues about breach of fiduciary duty also run afoul of *Vickers v. Starcher,* 175 Md. 522, 2 A.2d 678 (1938). In that case the Court of Appeals held that four issues were properly refused because they inquired into whether the executor, in four different respects, had been guilty of "negligence." The issues, however, did not define for the jury precisely what negligence consisted of. If a jury answered, "Yes," to the inquiries, the Court of Appeals held

that such unadorned answers would be too vague and indefinite in their meaning to be of any help to the Orphans' Court.

> *Issues three to six,* inclusive, *would require a determination* by the jury, in answering them, *as to whether the surviving executor was guilty of negligence* in paying interest upon certain claims, in paying the Francis note, counsel fees, and the note due by the estate to the First National Bank. . . . [W]e think all these issues are improper in failing to require information upon which the Orphans' Court could act intelligently. *For instance, what is meant by "negligence"?*

175 Md. at 530–31, 2 A.2d 678 (emphasis supplied). And see *Myers v. Hart,* 248 Md. 443, 446–47, 237 A.2d 41 (1968). The four issues dealing with a breach of fiduciary duty were not proper issues for transmittal to the circuit court.

And then there were four. Two of those issues inquire as to "good faith and just cause" as required by § 7–603.

> 1. *Did Charles J. Kresslein,* Jr., as Personal Representative of the Estate of Viola M. Uhl, deceased, acting with the powers and duties of a Special Administrator, *defend the* Petitioners' *caveat petition* and related proceedings *in good faith and with just cause?*

> 9. *Did Thomas J. Renner,* in his capacity as the Court appointed Special Administrator of the Estate of Viola M. Uhl, deceased, *defend the* Petitioners' *caveat petition in good faith and with just cause?*

(Emphasis supplied).

Two of the issues inquire as to whether the legal expenses were "necessary," a factor that *Piper Rudnick,* 386 Md. at 218, 872 A.2d 58, refers to as a neglected aspect of § 7–603 and a factor that would seem to be a part of the "benefit to the estate" inquiry pursuant to § 7–602.

> 3. *Were the legal fees and expenses* incurred by Charles J. Kresslein, Jr., in his capacity as Personal Representative of the Estate of Viola M. Uhl, deceased, acting with the powers and duties of a Special Administrator,

*necessary for the defense of the caveat* and related proceedings instituted by Petitioners?

10. *Were the legal fees and expenses* incurred by Thomas J. Renner, in his capacity as Special Administrator, *necessary for the defense of the caveat* proceedings instituted by Petitioners?

(Emphasis supplied).

On April 6, 2005, the Orphans' Court denied the appellants' Petition for the Transmission of Issues. On May 3, the appellants appealed from that denial, and the propriety of that appeal is now before us.

## A. The Transmittal of Issues, Generally

Although it is of ancient lineage, the practice of an Orphans' Court's transmitting issues to a circuit court for jury fact-finding is, by any reckoning, an odd procedure.[22] The measure is a child born of necessity. An orphans' court, having no jury of its own, sometimes needs to borrow one from someone else, even as it might need to borrow a bailiff or the use of a courtroom. In Maryland's four-tiered judicial system, that someone else is, by process of elimination, the circuit court, for only the circuit court possesses the jury that needs to be borrowed.

The operative statutory language is now Estates and Trusts Article, § 2–105(b).

(b) *Transfer of determination to law court.*—At the request of an interested person made within the time determined by the court, the issue of fact may be determined by a court of law. When the request is made before the court has determined the issue of fact, the court shall transmit the issue to a court of law.

That statutory provision is supplemented by Maryland Rule 6–434 "Transmitting issues."

---

**22.** Because something odd is old is no reason to kowtow.

In *Hill v. Lewis,* 21 Md.App. 121, 126 n. 2, 318 A.2d 850, *cert. denied,* 272 Md. 742 (1974), Chief Judge Orth traced for this Court the pedigree of what is now § 2–105. When the Orphans' Court was established by the Acts of 1777, Feb. Sess., ch. 8, the General Assembly initially "empowered each orphans' court ... to call a jury of twelve freeholders of the county to assist in the determination of the issue." Within the year, however, the Acts of 1798, ch. 101, III, subchapter 15, § 17 revised the practice "by requiring the orphans' court, at the election of either party to a controversy, to direct issues to be sent to any court of law that might be most convenient for the trial thereof." See *Forsythe v. Baker,* 180 Md. 144, 147–48, 23 A.2d 36 (1941).

Philip L. Sykes, *Contest of Wills in Maryland* (1941), § 21, p. 29, addressed the even earlier origins of the procedure.

> The practice of framing and directing issues to be tried by a jury was borrowed from Chancery and the ecclesiastical courts of England. It was in vogue in this state prior to the passage of the act of 1798, which codified the testamentary system. . . . They are sent to a court of law for trial in order that the questions of fact in dispute may be determined by a jury.

See also *Myers v. Hart,* 248 Md. 443, 446, 237 A.2d 41 (1968).

In *Kao v. Hsia,* 309 Md. 366, 373, 524 A.2d 70 (1987), Judge Adkins also discussed the early history.

> The practice of sending issues from an orphans' court to a circuit court is also of ancient lineage. In 1798 the laws relating to orphans' courts were comprehensively amended and expanded, and the power to transmit issues was expressly conferred. Ch. 101, III, ch. 15, s. 17, Acts of 1798. The practice was apparently borrowed from the early chancery and ecclesiastical courts. *Pegg v. Warford,* 4 Md. 385, 393 (1853).

As a convenient usage, we have consistently been referring to the transmitting of issues to "the circuit court." The earlier caselaw and, indeed, the statutes from 1798 to the present refer to the transmittal as one to "a court of law."

That once was a very important distinction that is no longer necessary. What is now the circuit court historically embraced both law courts and equity courts, and the equity court was just as bereft of juries as was the orphans' court itself. It had no jury to lend and was no fit destination for the transmittal of issues. The transmittal of issues, therefore, had to be very carefully directed to "a court of law."

Indeed, equity courts would themselves sometimes send an issue to a law court for an advisory jury verdict, until Rule 517 (now Rule 2–511(d)), adopted in 1961, did away with that "little-used practice." See *Kao v. Hsia,* 309 Md. at 374 n. 8, 524 A.2d 70. In any event, for purposes of discussing the transmittal of issues to a jury, "court of law" and "circuit court" may now be used interchangeably for designating the place where an available jury may be found.

▪ After issues are properly transmitted to the circuit court, what follows is a hybrid procedure. Jurisdiction over the case always remains with the Orphans' Court, even after transmittal. Just as the Orphans' Court, in effect, borrows the jury from the circuit court, it also, in effect, delegates to the circuit court judge the task of being the jury's on-site referee. The ordinarily inherent power of the circuit court judge is significantly curtailed, because the case itself still belongs to the Orphans' Court and not to the circuit court.

*Holland v. Enright,* 167 Md. 604, 607–08, 175 A. 466 (1934), has given us the classic characterization of this limitation on judicial authority.

The issues were transmitted to *the Circuit Court* for Baltimore County under the power and authority of [§ 2–105], which limit its jurisdiction and direct its procedure. Apart from the statute it has no authority. *Its function,* as prescribed by the statute, *is neither that of an appellate nor, strictly speaking, that of a court of original jurisdiction, but rather that of a tribunal ancillary to the orphans' court,* whose aid is invoked for the single purpose of determining issues of fact submitted to it by the orphans' court for its guidance in dealing with some matter before it. *The*

*court of law to which they have been transmitted has no concern whatever with anything that transpired in the orphans' court in connection with the framing of such issues.*

(Emphasis supplied).

The Court of Appeals went on to describe the limited authority of the circuit court when it is operating in that tightly constrained capacity.

*It was not acting in the exercise of its ordinary powers as a court of general jurisdiction.* ... The power of the court and its duty was to see that a verdict, upon the issues propounded for inquiry before a jury was reached by legal steps, and competent and legal evidence. *It was the province of the court to decide all questions necessarily incidental to the bringing to trial and verdict; and when a verdict was obtained, to certify it to the Orphans' Court, whence the issues came.*

167 Md. at 609, 175 A. 466 (emphasis supplied). See also *Ades v. Norins,* 204 Md. 267, 273, 103 A.2d 842 (1954); *Forsythe v. Baker,* 180 Md. at 148–49, 23 A.2d 36; *Hill v. Lewis,* 21 Md.App. at 126, 318 A.2d 850.

 On the other hand, the circuit court judge, even as a mere on-site referee, enjoys considerable authority in controlling the jury trial. As early as 1881, *Diffenderffer v. Griffith,* 57 Md. 81, 84 (1881), had declared:

*The power of the court* and its duty *was to see that a verdict,* upon the issues propounded for inquiry before a jury *was reached by legal steps, and competent and legal evidence. It was the province of the court to decide all questions necessarily incidental to the bringing to trial and verdict;* and when a verdict was obtained, to certify it to the Orphans' Court, whence the issues came.

(Emphasis supplied).

*Schmeizl v. Schmeizl,* 184 Md. 584, 598–99, 42 A.2d 106 (1945), similarly declared:

Judgment in the plenary proceeding is entered by the Orphans' Court, but the determination of the court of law on

issues is final and is binding on the Orphans' Court. *The court of law has the same powers, with respect to the jury and the verdict, as in an ordinary action, including "power to direct the jury and grant a new trial." A jury may be waived.* This court may reverse a determination on issues "without a new trial" and in so doing may authorize the lower court to "direct a finding of the issues in conformity with this opinion and certify such finding" to the Orphans' Court.

(Emphasis supplied).

■ *McIntyre v. Saltysiak*, 205 Md. 415, 424, 109 A.2d 70 (1954), also made it clear that the prerogatives of the circuit court judge include that of taking an issue away from the jury if the evidence is not legally sufficient to support a finding.

*Whether sufficient evidence was offered* to justify the submission of issues to the jury *is a question of law for the court. If* there is not sufficient evidence and *the jury would only be left to speculation and conjecture on the issues submitted, the court should refuse to submit such issues,* should direct a verdict, and withdraw those issues from the jury.

(Emphasis supplied).

*Kao v. Hsia*, 309 Md. at 379, 524 A.2d 70, enumerated some of the necessary powers of the circuit court judge in regulating the fact-finding process.

[T]he circuit court may, in an issues case, direct a verdict, grant a new trial, or grant summary judgment.

The limitation, of course, is that such powers only exist for the purpose of supervising the trial process before the jury.

*[T]he circuit court may only "decide* all *questions necessarily incidental"* to the determination of *"the issues propounded. . . ."* It cannot decide questions of law that do not relate to those issues.

*Id.* (emphasis supplied).

Perhaps the strangest feature of this already strange enough practice of shipping issues off to another tribunal is

that, notwithstanding the fact that the Orphans' Court itself is competent to make findings of fact, a party before it may invoke § 2–105 to transmit issues to the circuit court and, once there, waive a jury trial. See *Kao v. Hsia,* 309 Md. at 378, 524 A.2d 70; *Schmeizl v. Schmeizl,* 184 Md. at 598, 42 A.2d 106. The practical necessity that explains resort to a circuit court jury is no rationale for this aberration. It would appear to be simply a quirk, for which the reasons are lost in the mists of history.

In *Kao v. Hsia,* 309 Md. at 374, 524 A.2d 70, however, Judge Adkins suggested that an historical explanation for this apparent incongruity may be found in the concurring opinion of Chief Judge Brune in *Phillips v. Phillips,* 215 Md. 28, 38–39, 136 A.2d 862 (1957). Judge Brune thought that one of the reasons for transferring factual issues to the law courts in 16th Century England lay not simply in the desire for a jury but in the fact that the fact-finding procedures available in chancery courts and ecclesiastical courts were notoriously ineffective and unreliable.[23]

One downside to outsourcing the fact-finding to a different tribunal is the shameful expenditure of time. The time consumed in this case between the farming out of issues on October 10, 2001 and the rendering of the answers on June 24, 2004 was a few months short of three years.[24]

---

23. Highly pertinent is the observation of Oliver Wendell Holmes in "The Path of the Law," 10 HARV. L.REV. 457, 469 (1897):

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

24. One has to wonder whether the appellants, once aware of not prevailing on their first contention, would really wish to prevail on the second contention. Would it behoove them to spend another year or two going back to the circuit court for another multi-day trial that would, in large measure, rehash what was presented to the first jury in 2004?

Taken into consideration would have to be the fact that, after the Orphans' Court finally makes its decision on the fee petitions and exceptions in this case, there will almost inevitably be another appeal.

In any event, the appellants successfully utilized this procedure under Rule 2–105 in caveating the purported Will of July 1, 1996. A six-day jury trial in the Circuit Court for Baltimore County, from June 16 through June 24, 2004, yielded them the six answers to issues that were dispositive in their favor. Their attempt to utilize the procedure for a second time, however, is another matter.

## B. Immediate Appealability of a Transmittal Order, Generally

 A number of high-profile cases establish the indisputable principle that an order of an Orphans' Court framing an issue and then submitting that issue to the circuit court is immediately appealable. In *Senk v. Mork,* 212 Md. 413, 416, 129 A.2d 675 (1957), Chief Judge Brune observed.

> In the Orphans Court ... *an order was entered* on May 31, 1956, *directing that the issues be transmitted* to the Circuit Court. *The appeal is from that order. No question is raised as to its being an appealable order.*

(Emphasis supplied).

In the earlier case of *Little Sisters of the Poor v. Cushing,* 62 Md. 416, 421 (1884), the Court of Appeals had held that an appeal from the granting of issues had not been timely taken, but, in doing so, stated:

> If [the issues] were granted improperly or improvidently, the party aggrieved has a right of appeal within thirty days after they were granted; and not subsequently.

In *Langhirt v. Hicks,* 153 Md. 31, 33–34, 137 A. 482 (1927), the orphans' court had made a finding in which it stated:

> *[T]he caveatrix ... "is entitled to have the issues* of fact raised by her said caveat and the answer thereto, as to the validity and genuineness of the alleged last will and testa-

---

For litigational purposes, there is already a mountain of high-grade ore waiting to be mined.

ment of Margaretha Langhirt, deceased, *sent to a court of law to be determined by a jury.*"

(Emphasis supplied).

The Court of Appeals denied an immediate appeal from that finding, holding that it "was nothing more than the opinion of the court." It nonetheless speculated:

It is not from a final order, or indeed from any effective order. No doubt another order would have followed, sending issues to a court of law. *From such an order an appeal would lie.* The order passed was nothing more, in effect, than the opinion of the court.

153 Md. at 34, 137 A. 482 (emphasis supplied). See also *Safe Deposit and Trust Co. v. Hanna*, 159 Md. 452, 455, 150 A. 870 (1930).

After surveying a number of earlier cases, *Schlossberg v. Schlossberg*, 275 Md. 600, 611, 343 A.2d 234 (1975), pronounced its judgment:

A distillation of the holdings in all these cases leads to the conclusion that in caveat proceedings *once issues have been framed by an Orphans' Court and transmitted to a court of law for trial, such an order is "final" and appealable.*

(Emphasis supplied).

*Holland v. Enright*, 169 Md. 390, 397, 181 A. 836 (1935), similarly stated:

*If the issues were granted improvidently or improperly, the party aggrieved has a right of appeal* within thirty days after the order that granted the issues.

(Emphasis supplied).

In *Hegmon v. Novak*, 130 Md.App. at 709–11, 747 A.2d 772, Judge Sally Adkins thoroughly surveyed the decisions of the Court of Appeals over the decades and concluded:

Accordingly, we hold that *the order transmitting issues was a final judgment* within the meaning of CJ section 12–101(f).

130 Md.App. at 711, 747 A.2d 772 (emphasis supplied).

There is a curious common feature in every one of these cases. They all concern appeals from the affirmative order of

an Orphans' Court framing and transmitting issues to the circuit court. Not one of them touches the converse situation of an Orphans' Court's having denied a petition to transmit issues. Indeed, the rationale given by *Holland v. Enright*, 169 Md. at 395, 181 A. 836, to explain immediate appealability dealt with the consequences of an affirmative order of transmittal but not with a negative denial of transmittal.

*Nugent v. Wright*, 277 Md. 614, 616, 356 A.2d 548 (1976), to be sure, said the magic words:

> Preliminarily, we note that *an appeal*, pursuant to Maryland Code (1974), Courts & Judicial Proceedings Article § 12–501, *will lie from an order granting or refusing to grant issues*.

(Emphasis supplied).

*Nugent*, however, was itself an appeal from the granting of issues, not from the denying of issues. The two cases it cited were cases dealing with the affirmative act of granting issues. There was no discussion to indicate that the bilateral phraseology "granting or refusing" was anything other than inadvertent, not even so much as a conscious dictum.

Significantly, the decision of the Orphans' Court of April 6, 2005, from which the appellants are attempting to appeal is not an order transmitting issues, but a denial of a petition to transmit issues. Accordingly, at oral argument we pushed the appellants hard on the question of whether immediate appealability from an issues order is only unilateral or is truly bilateral. May it lie from a denial of transmittal as well as from a grant of transmittal?

Our deeper examination of this nuance, however, has persuaded us that the appellants were absolutely right. *Barroll v. Reading*, 5 H. & J. 175 (1821), is the fountainhead decision. The appellants in that case were attempting to caveat a will. They sought, initially imperfectly but ultimately effectively, a plenary hearing and the submission of an issue to a jury, which application was denied by the Orphans' Court. In reversing that order to deny the transmission of issues, Judge Buchanan held:

*[T]he Court was clearly wrong in refusing to direct* a plenary proceeding, and *an issue or issues to be made up and sent to a Court of law for trial* on the application of the appellants, as directed by the sixteenth and seventeenth sections of the fifteenth sub-chapter of the Act of 1798, ch.. 101, which are imperative.

5 H. & J. at 176 (emphasis supplied).

The Court of Appeals went on to elaborate.

*The objection that an appeal will not lie in such a case as this,* and that the record is not properly before us, *cannot be sustained. The language of the Act of Assembly is, "any person* who may conceive him or herself aggrieved by any judgment, decree, decision or order, of the Orphans' Court, *shall have the liberty of appealing,"* & c. *emphatically giving an appeal from any decision of the Orphans' Court;* and *it is quite clear that a refusal* of a prayer proffered by a party to a contest in that Court, *is a decision of the Court* upon such prayer.

*Id.* (emphasis supplied).

Citing *Barroll v. Reading,* 1 Sykes, *Probate Law and Practice* (1956), § 243, p. 252, states the Maryland practice.

It has been held that an appeal may be taken from an order *granting or refusing* to grant issues.

(Emphasis supplied).

 A decision by an Orphans' Court to deny the transmittal of issues is a final judgment within the contemplation of Courts and Judicial Proceedings Article, § 12–501, as surely as would be the affirmative grant of such an order. As such, it is immediately appealable.

## C. Issues Affecting Attorney's Fees As Appropriate for Transmittal

 The immediate appealability of the order of the Orphans' Court to refuse to transmit issues will be of no solace to the appellants, however, unless the issues sought to be transmitted are, in terms of their purpose, appropriate for trans-

mittal in the first place. As Judge Adkins told us in *Kao v. Hsia,* 309 Md. at 374, 524 A.2d 70:

> An orphans' court may not send *any* issue of fact to a circuit court for determination.

All of the issues that were the subject of the Orphans' Court's denial of April 6, 2005, unquestionably had a bearing on the two petitions for attorneys' fees and the appellants' exceptions thereto. At that point in the proceedings, moreover, they had no other purpose. The Petition for Transmission of Issues recited the context in which and for which the request was being made.

> *Pending before this Court are petitions for the award and allowance of attorneys' fees,* expenses and costs incurred in connection with or related to the caveat proceedings instituted by Petitioners in this case.

(Emphasis supplied). The appellants also averred in their appellate brief that the issues bore on the entitlement of the petitioners to legal fees.

> *Appellants proposed issues* regarding breach of fiduciary duty, conflict of interest by a fiduciary, "good faith" and "just cause" all plainly involve disputed questions of fact, the resolution of which *will aid the Orphans Court in resolving the ultimate entitlement, if any, of Appellees to fees and expenses in this case.*

(Emphasis supplied).

In *Miller v. Gehr,* 91 Md. 709, 47 A. 1032 (1900), the executors of a will petitioned the Orphans' Court for the payment of a fee to the attorneys who had represented them in an unsuccessful caveat proceeding. The successful caveators filed exceptions, alleging that the fee was "excessive, oppressive and unreasonable." The court set the petition down for a hearing and the exceptants then filed another petition in which they "prayed that issues be framed and transmitted to a Court of law." The Orphans' Court denied that request for the transmittal of issues. An appeal was taken. 91 Md. at 713, 47 A. 1032.

The Court of Appeals, in affirming the Orphans' Court, pointed out that the decision of 1) whether to award a fee and 2) what is the reasonable amount of a fee was one entrusted to the discretion of the Orphans' Court and was not, therefore, an appropriate issue to be submitted to a circuit court jury.

> *[W]e do not think that such issues were proper. It is for the Orphans' Court to determine, what fee shall be allowed* the attorneys who represented the executors, and *it is not a proper subject for issues.* The Orphans' Court is bound by the finding of a jury on issues properly framed and transmitted to a Court of law, and therefore, if the allowance of fees is a proper subject for the consideration of a jury, it, and not the Court, would determine that question.

91 Md. at 716–17, 47 A. 1032 (emphasis supplied).

In *Maynadier v. Armstrong,* 98 Md. 175, 56 A. 357 (1903), the primary reason relied on by the Court of Appeals for affirming a decision of the Orphans' Court not to transmit issues to a jury was that the hearing on the merits before the Orphans' Court had actually begun. The Court of Appeals also noted, however, that certain of the issues dealt with matters within the discretion of the Orphans' Court and were, therefore, not appropriate issues for transmittal in any event.

> At least *some of them are not proper subjects for issues.* For example, one was, "Are said administrators entitled to an allowance for the sum of $147.00 for funeral expenses paid Henry Tarring, or any part thereof, and if so, for what sum." Section 5 of Article 93 of the Code expressly provides for "funeral expenses to be allowed at the discretion of the Court according to the condition and circumstances of the deceased, not to exceed three hundred dollars." It is for the Orphans' Court and not a jury to determine whether such an allowance should be made. *Another issue framed was whether the administrators are entitled to an allowance* for the sum of $50.00 *for attorneys' fees paid by them,* or any part thereof. We decided in *Miller v. Gehr,* 91 Md. at 717, 47 A. 1032, that *such question is not a proper subject for issues, as the Orphans' Court must determine it,* subject

to the right of appeal to this Court as to the reasonableness of the allowance.

98 Md. at 180, 56 A. 357 (emphasis supplied).

1 Sykes, *Probate Law and Practice* (1956), § 223, p. 236, is in complete agreement:

> *Issues* which relate ... to questions that are within the court's discretion, *such as counsel fees*, or funeral expenses, *are improper.*

(Emphasis supplied). 2 Sykes, § 893, p. 52, reiterates:

> *Counsel fees are not a proper subject of issues. It is the duty of the court*, and not of a jury, *to determine the reasonableness of a fee.*

(Emphasis supplied).

In their reply brief in a single passing sentence without legal citation or argument, the appellants seem to suggest that the rule of *Miller v. Gehr* and *Maynadier v. Armstrong* applies only to the dollar amount of the fees in issue and not to "the factual issues of good faith, just cause and conflict of interest" on the part of the special administrators.

 We do not agree. The discretionary decision that is entrusted to the Orphans' Court with respect to fee petitions is an indivisible, albeit two-pronged, inquiry that embraces 1) the decision of the special administrator to engage counsel as surely as it does 2) the size of the bill submitted by the attorneys. 2 Sykes, *Probate Law and Practice*, § 895, p. 54, spells out the dual nature of the necessarily intertwined issue entrusted to the Orphans' Court.

> The action of the Orphans' Court in allowing fees may be reviewed on appeal; *first, as to the authority to make such allowance* in the particular case; *second, as to the reasonableness of the fee* allowed.

(Emphasis supplied).

In *National Wildlife Federation v. Foster, supra,* the case was remanded so that the Orphans' Court, in making its decision as to whether to award interim attorneys' fees, could consider whether the personal representative had acted in

good faith and with just cause in incurring the attorneys' fees. Both the evidentiary hearing and the ultimate decision were within the province of the Orphans' Court.

> Based upon the test we have created today, we believe *an evidentiary hearing was required* and its denial was an abuse of discretion. *We thus remand to the orphans' court so that such a hearing may be held.*

83 Md.App. at 500, 575 A.2d 776 (emphasis supplied).

In *Fields v. Mersack,* 83 Md.App. at 658–59, 577 A.2d 376, we also remanded the case to the Montgomery County Orphans' Court so that the judge, in determining whether the attorney's fee was properly chargeable to the estate, could consider whether the "personal representative had acted in good faith and with just cause." The question of good faith was an inextricable part of the decision with respect to the attorney's fee.

> *[I]t is a factual question whether a personal representative has acted in good faith and with just cause in defending or prosecuting a caveat proceeding.* Because that issue is neither presented to nor decided by the jury in a caveat proceeding, *that factual determination must be made by the trial judge, to whom the issue of the source of the payment of the attorney's fees is presented.*[25]

(Emphasis supplied).

The appellants' second contention seeks to appeal a non-appealable order. We hold that because all of the issues which the appellants, on March 2, 2005, sought to have transmitted to the circuit court for fact-finding by a jury concerned the discretionary decision of awarding attorneys' fees, a subject within the exclusive domain of the Orphans' Court, those issues were not appropriate for transmittal. And then there was none.

---

25. Lest the use of the term "trial judge" muddy the issue, let it be noted that this case was from Montgomery County, where, as in Harford County, a circuit court judge sits as the Orphans' Court judge. The reference in the opinion is to the person sitting in the capacity of an Orphans' Court judge. There is no wriggle room.

## Afterthought

The Orphans' Court was scheduled to continue its consideration of the fee petitions on March 11, 2005. When it finally receives this case on remand for that purpose, another year will have gone by.[26] Even as in *Bleak House,* personal representatives and special administrators have come and gone, lawyers and law firms have come and gone, Orphans' Court judges have come and gone, and one of two original legatees has not lived to see her legacy. Yet new fees continue to accrue even as old fees are being challenged. *Jarndyce and Jarndyce* marches relentlessly on.

**APPEAL DISMISSED AND CASE REMANDED TO THE ORPHANS' COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLANT.**

---

**26.** Unless, of course, there is a petition for certiorari.